## IN THE UNITED STATES DISTRICT COURT OF
## FOR THE DISTRICT OF COLUMBIA

**KATHLEEN M. BEUSTERIEN,**
**3523 Albemarle Street, N.W.**
**Washington, DC  20008,**

        **Plaintiff,**

  **v.**

**TIME WARNER, INC.**                          CIVIL ACTION NO. _____
**(f/k/a AOL TIME WARNER INC.)**
**75 Rockefeller Plaza**
**New York, NY 10019,**

**AMERICA ONLINE, INC.**                   JURY TRIAL DEMANDED
**22000 AOL Way**
**Dulles, VA  20166,**

**STEPHEN M. CASE**
**c/o TIME WARNER, INC.**
**75 Rockefeller Plaza**
**New York, NY 10019,**

**ROBERT W. PITTMAN**
**c/o TIME WARNER, INC.**
**75 Rockefeller Plaza**
**New York, NY 10019,**

        **Defendants.**

Plaintiff Kathleen M. Beusterien, by counsel, for her Complaint against defendants Time

Warner, Inc. and America Online, Inc., Stephen M. Case, and Robert W. Pittman, now states as

follows:

### NATURE OF ACTION

1.     Plaintiff seeks to recover damages she incurred from purchasing common stock

issued by Time Warner, Inc., formerly known as AOL Time Warner Inc. ("AOLTW or

"Company") and its wholly owned subsidiary, America Online, Inc. ("AOL"), at artificially

inflated prices.  AOLTW was formed as a result of the $350 billion merger ("AOL-TW Merger" or "Merger") between AOL and Time Warner Inc. on January 11, 2001.[1]  Defendants prepared and disseminated to the investing public materially false and misleading information about the Company's performance and financial condition which, at the time plaintiff made her investment, caused the common stock of the Company to trade at artificially inflated levels.  As a result of Defendants' misconduct, Plaintiff has lost more than $10,000 that she hoped would one day be available to fund her child's education.

2.      In sum, Plaintiffs allege that AOLTW, AOL, and HTW (collectively, the "Defendants"), engaged in financial and accounting violations, and issued a series of false and misleading statements concerning the business, financial results and operating condition of AOL and AOLTW before, during and after the AOL-TW Merger, which materially misled Plaintiff and other investors.  By these actions, Defendants misrepresented and concealed AOL's deteriorating financial condition, which caused AOL's stock to trade at artificially inflated prices and thereby helped enable AOL to acquire HTW.   Following the AOL-TW Merger, the Defendants continued to mislead investors and misrepresent the business, financial results and operating condition of the then-combined AOLTW, all of which ultimately required the Company to restate and reverse hundreds of millions of dollars in revenues and earnings it previously reported for the fiscal years 2000-2002.  To date, AOLTW has restated $190 million of revenues and $97 million in earnings, and has said it may restate up to another $400 million of revenues.  In addition, top AOL and HTW insiders reaped for themselves over one billion dollars

---

[1]      As of October 16, 2003, AOLTW changed its name back to "Time Warner Inc.", and also changed the name of its publishing subsidiary from Time Warner Inc. to Historic TW, Inc. ("HTW").  Reference to HTW in this Complaint also includes the original, pre-Merger Time Warner Inc. as the context may require.

in insider trading profits and other benefits by selling millions of their AOL and AOLTW shares also at artificially inflated prices before, during and soon after the Merger.

3.     The U.S. Securities and Exchange Commission (the "SEC") and the U.S. Department of Justice (the "DOJ") have been conducting investigations into the accounting and disclosure practices of the Company.  Recently, the Company announced that it had reached a settlement with the SEC.

4.     Plaintiff makes this complaint based upon personal knowledge with respect to her own acts, and upon a review and analysis of public documents, news reports, analysts' reports, news releases by the defendants, prospectuses issued by defendants, and information available over the internet.

## JURISDICTION

5.     Plaintiff's claims arise under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Accordingly, jurisdiction and venue are also proper in this Court under § 22 of the Securities Act, 15 U.S.C. § 77v.

6.     This Court has jurisdiction over the subject matter of this action pursuant to Section 11-921(a) of the Code of the District of Columbia.

## THE PARTIES

7.     Plaintiff Kathleen M. Beusterien is an adult citizen of the District of Columbia who purchased and sold shares of the Company while residing in the District of Columbia.  As a result of Defendants' violations, Plaintiff acquired 200 shares of AOL common stock at an inflated price of more than $70 per share.  Plaintiff has suffered damages as a result of defendants' wrongful conduct, as alleged more fully below.

8.     AOLTW is a Delaware corporation with its principal offices in New York, NY. AOLTW claims to be the world's first fully integrated, Internet-powered media and

communications company, and was formed as a result of the January 11, 2001 AOL-TW Merger. AOLTW operates on a fiscal year ending December 31. AOLTW's common stock is publicly registered under the Securities Act and had been trading on the New York Stock Exchange ("NYSE") under the ticker symbol "AOL" until October 16, 2003, when the Company converted back to using HTW's original, pre-merger ticker symbol, "TWX". AOLTW is named as a defendant individually as a result of its own acts and, as a successor-in-interest, and/or otherwise responsible for, the acts and liabilities of its predecessor companies.

9.     AOL is a Delaware corporation with its principal offices in Dulles, VA. It is currently a wholly owned subsidiary of AOLTW. AOL is a provider of internet and electronic commerce goods and services. Before the AOL-TW Merger, AOL operated on a fiscal year ending June 30; following that Merger, AOL has operated on AOLTW's fiscal year ending December 31. Prior to the Merger, AOL's common stock was publicly registered under the Securities Act, and traded on the NYSE under the ticker symbol "AOL".

10.     HTW is a Delaware corporation with its principal offices in New York, NY, and a wholly owned subsidiary of AOLTW. HTW was created in 1996 when Time Warner Companies, Inc. and Turner Broadcasting System, Inc. merged. HTW creates and distributes information and entertainment throughout the world via cable networks, music publishing, television, films and cable and digital media. Before and following the AOL-TW Merger, HTw has operated on a fiscal year ending December 31. Prior to the Merger, HTW's common stock was publicly registered under the Securities Act, and traded on the NYSE under the ticker symbol "TWX".

11.     Stephen M. Case ("Case") co-founded AOL in 1985. He served as its Marketing VP from 1985 to September 1987; Executive VP from September 1987 to January 1991; a Director since AOL first became a public company in September 1992; CEO beginning in April

1993; Board Chairman beginning in October 1995; and continued as CEO and Chairman until the AOL-TW Merger was consummated on January 11, 2001. Following the Merger, Case became the Chairman of the Board of AOLTW. On January 12, 2003, Case resigned from AOLTW. Case signed the cover letter in the Joint Proxy/Prospectus sent to AOL and HTW shareholders on May 23, 2000 recommending shareholder approval of the AOL-TW Merger; AOL's Forms 10-K and 10-K/A for the fiscal years ended June 30, 1998, 1999, and 2000; AOL's Forms 10-Q and 10-Q/A for the fiscal quarters ended March 31, 1998, September 30, 1998, December 31, 1998, March 31, 1999, September 30, 1999, December 31, 1999, March 31, 2000 and September 30, 2000; AOLTW's Forms 10-K for the fiscal years ended December 31, 2000, 2001 and 2002; and was named in AOLTW's May 19, 2000 Amendment No. 4 to Form S-4 Registration Statement for the AOLTW Merger (the "Merger Registration Statement") as being, or about to become, a director of AOLTW following the Merger.

12.     Robert W. Pittman ("Pittman") was President and CEO of Time Warner Enterprises, a major affiliate of HTW, from 1990 to September 1995; joined AOL in November 1996 as President and CEO of AOL Networks, a division of AOL; became President and COO of AOL in February 1998; and was a Director of AOL. Following the AOL-TW Merger, Pittman served as a Director and Co-COO of AOLTW, and became AOLTW's sole COO in May 2002. On July 18, 2002 — the day the AOLTW Board of Directors met and The Washington Post ran the first installment of a two-day article discussing certain of AOL's accounting practices — Pittman abruptly resigned as COO and as acting head of AOL. Pittman signed the Bond Registration Statement; AOL's Forms 10-K and 10-K/A for the fiscal years ended June 30, 1998, 1999, and 2000; AOLTW's Forms 10-K for the fiscal years ended December 31, 2000 and 2001; and was named in the Merger Registration Statement as being, or about to become, a director of AOLTW following the Merger.

## SUBSTANTIVE ALLEGATIONS

13.     Beginning in the 1990's, AOL's principal stream of revenue growth moved from providing its customers with "pay-by-the-hour" internet access, to a "flat-rate" price imposed typically on a monthly basis. This change initially resulted in a drop in AOL's internet subscription revenues and declining profit margins in its online service.  Consequently, AOL sought growth in other areas, and online advertising quickly emerged to become AOL's fastest-growing business unit.  However, by the late 1990's and into 2000 when the AOL-TW Merger was announced, many of the internet, technology and software companies that advertised over the internet and on which AOL was increasingly relying for revenue growth, began to fail.  This jeopardized not only AOL's ability to report consistently to investors that its revenues and earnings were increasing, but also AOL's ability to consummate the Merger and acquire HTW. As a result, in the late 1990's AOL began to enter into a series of financial transactions that created the appearance it was earning and properly reporting revenues and income, but which in actuality either produced no real revenues or earnings at all to AOL or resulted in materially less revenues and earnings to AOL than AOL reported to Plaintiffs and other investors.  These improper financial transactions took several different forms, all of which had in common that they enabled AOL to report artificially inflated revenues and earnings.

14.     For example, AOL engaged in several "round-trip" transactions.  These types of transactions typically involved AOL buying goods or services from a second company, Company #2, for which it would intentionally overpay; Company #2, in turn, simultaneously agreed either to funnel AOL's overpayments directly back to AOL under the guise of advertising revenue, or to do so indirectly by buying goods or services from another party, Company #3, which, in turn, agreed to "round-trip," or pay at least part of the consideration it received from Company #2, back to AOL in the form of advertising.  Each of the parties agreed to these

financial arrangements before any part of the transaction would take place, and Companies #2 and #3 would not agree to proceed unless AOL funded the transaction from the outset. In effect, AOL materially overpaid for goods or services to ensure that its counter-party would enter into the transaction and buy advertising from AOL. Accordingly, the actual economic substance of these "round-trip" transactions was that AOL was using its own dollars to "buy" advertising from itself, reporting those dollars to investors as newly and properly earned revenues, and thereby inflating its financial condition, revenues, income and, consequently, stock price. The 16 separate sham transactions AOL/AOLTW engaged in with Homestore, Inc. in 2000 and 2001 described more fully below — which have resulted in guilty pleas to criminal offenses by seven Homestore executives and an ongoing investigation of AOL/AOLTW — are typical of AOL's/AOLTW's round-trip transactions. These transactions resulted in no real revenues to AOL/AOLTW because its own money was used by the parties and merely round-tripped back to AOL/AOLTW under the guise of advertising purchases. AOL planned and executed these types of sham transactions before the AOL-TW Merger, and AOLTW continued to engage in such transactions following the Merger.

15.    Another example of round-tripping occurred in September 2000, when AOL negotiated a transaction to pay Veritas Software Corp. $50 million for software worth $30 million. The $20 million overpayment was then round-tripped back to AOL in a purportedly separate transaction in which Veritas "purchased" online advertising from AOL. Reportedly, the parties originally agreed that AOL would pay $30 million for the software, which was its fair market value. However, Veritas initially took the position that it did not want to advertise on AOL and was not going to pay to do so. Consequently, AOL raised the-contract amount to $50 million, with the extra $20 million being described by one former employee as a "kick-back" arrangement in order to consummate the deal. That $20 million overpayment was then funneled

back to AOL/AOLTW and reported to Plaintiffs and other investors as newly earned advertising revenue when, in actuality, those dollars belonged to AOL from the outset.  In fact, Veritas subsequently settled an SEC investigation into its role in this transaction by restating its financial results for 2000 and 2001, and reversing and eliminating the $20 million overpayment which it originally booked and reported as revenue.

16.    These are just two examples of specific improper sham transactions engaged in by AOL/AOLTW.  As detailed below, AOL/AOLTW also engaged in other types of financial and accounting improprieties such as converting awards from legal disputes into advertising revenues; artificially boosting its reported number of Internet subscribers by selling bulk subscriptions to the employees of companies such as Target Corp., J.C. Penny and Sears Roebuck, and then booking more subscription revenues than those employees would actually pay; booking gross revenues from sales of goods or services where AOL/AOLTW was acting only as an agent, not as a principal, in the transaction and, thus, was entitled to book only its agreed upon commission or fee; counting the reprising of stock and other equity investments as newly earned advertising revenue when such reprising represented instead mere adjustments to the valuation of previously agreed upon transactions; converting certain "one-time" contract termination or modification fees into advertising revenue; and other similar transactions, the net effect of which was to inflate artificially the revenues and earnings AOLIAOLTW reported to investors, and give the impression of greater operating earnings than really existed.  In addition, while the improper accounting practices were most prevalent at AOL and AOLTW, other divisions of AOLTW, including HTW and its Time Warner cable unit, also engaged in similar improprieties, examples of which include the Oxygen Media and Golf Channel transactions described below.

17.    These types of round-trip transactions and other financial improprieties violated Generally Accepted Accounting Principles ("GAAP") and federal and state law.   Most fundamentally, GAAP requires that financial statements must represent the actual underlying economic substance of the information presented.   As noted by the SEC in its Accounting and Auditing Enforcement Release No. 817, In the Matter of Cypress Bioscience Inc. and Alex P. De, Soto, CPA, (Sept. 19, 1996): "[I]t is a well-established tenet of GAAP that transactions must be accounted for in accordance with their substance rather than their form."   Similarly, GAAP (Accounting Principles Board ("APB") Opinion 22) provides that "information about the accounting policies adopted by a reporting entity is essential for financial statement users.   When financial statements are issued purporting to present fairly financial position, changes in financial position, and results of operations in accordance with [GAAP], a description of all significant accounting policies of the reporting entity should be included as an integral part of the financial statements."   Further, GAAP mandates that revenues can be recognized only if they are earned (Financial Accounting Standards Board ("FASB") Concept Statement 5); that to be reliable, financial transactions must be reported on a basis that reflects "representational faithfulness" (FASB Concept Statement 2); that users of financial statements rely on the information presented about an enterprise's financial performance (FASB Concept Statement 1, ¶ 11 42 & 47); and that accounting information must be reliable and faithfully "represent[] what it purports to represent" (FASB Concept Statement 2).

18.    AOL's and AOLTW's sham and other improper financial transactions and accounting practices described more fully below violated GAAP because they did not represent the actual underlying economic substance of those transactions, nor did they fairly reflect the companies' financial position, operations and results.   Instead, these transactions and accounting practices inflated artificially the revenues and earnings AOL reported to Plaintiffs and other

investors in the years immediately preceding the AOL-TW Merger, and the revenues and earnings reported by AOLTW in its SEC flings and other public statements for the Merger and after the Merger had been consummated.

19.    In August 2002 — just 19 months following consummation of the AOL-TW Merger — AOLTW began admitting to financial and accounting violations requiring the Company to restate hundreds of millions of dollars of revenues and earnings AOLTW and AOL previously reported to Plaintiff and other investors.  By this time, the AOL-TW Merger had been described by commentators as one of the worst transactions in corporate history; the Company's stock price had collapsed from nearly $60 per share to less than $9.00 per share; AOLTW's market capitalization had dropped over $100 billion; and AOLTW subsequently dropped AOL from its name.  In addition, AOLTW took charges in the first and fourth quarters of 2002 totaling some $99.5 billion mostly to write-down the value of its AOL subsidiary, and incurred a net loss in fiscal year 2002 of $98.7 billion, among the largest in corporate history.  Reportedly, AOLTW may be required to make additional restatements.

20.    AOL began as a small start-up business in 1983 called Control Video Corp.  In May 1985, the company was renamed Quantum Computer Services Inc. and, in October 1991, became America Online, Inc.  After going public in 1992, AOL grew rapidly, proclaiming itself to be "the nation's fastest growing provider of online [internet] services with the most active subscriber base."  In November 1995, AOL established an online service in Germany, its first overseas business, and in 1996 expanded to Canada, France and England. In the late 1990s, AOL expanded by also purchasing other Internet-related companies, including Netscape Communications, MovieFone and AOL's online competitor, CompuServe.  By 1997, AOL reportedly had some 10 million online subscribers to its internet services.  As of June 30, 2003,

AOL reportedly had approximately 25.3 million U.S. subscribers and 6.2 million European subscribers to its internet services.

21.    By contrast, the original HTW was founded decades ago, and became one of the world's leading media and entertainment companies.  It was created by multiple mergers over the past 75 years, including the 1990 combination of Time Inc. and Warner Communications, Inc., and the 1996 merger with Turner Broadcasting System, Inc.

22.    Historically, publicly traded companies were valued by the investment community based at least in significant part on reported corporate earnings and cash flow. However, during the 1990's "internet boom", many internet companies had significant losses and negative cash flow, and were not expected to generate earnings or positive cash flow for some time.  As a result, investors increasingly based their expectations for internet companies in part on multiples of reported revenue.  These revenue multiples were often extraordinarily high by historical standards, but justified by issuers and their advisors on the basis of what they claimed to be the huge perceived potential of this new high-tech industry.

23.    This method of valuing internet companies based largely on multiples of their reported revenues applied to AOL. In fact, during the "internet boom" of the 1990s, AOL itself showed huge increases in reported revenues and its stock price skyrocketed — increasing many multiples from 1993 to 1998; in 1998 alone, AOL's stock price jumped 585°/x.  However, during the 1990s, AOL's revenue stream began to change. Partly as a result of increasing competition, in late 1996 AOL dropped its "pay-by-the-hour" method of charging its internet subscribers, and instead switched to a "flat-rate" price, typically imposed on a monthly basis. This change initially resulted in a drop in subscription revenues and declining profit margins in its online service, all of which forced AOL to look for growth in other areas.  One such

potentially high margin source was advertising revenue, and this quickly became the fastest growing segment of AOL's business.

24.     The growth of online advertising was fueled by the emergence of increasing numbers of internet and other technology companies beginning in the 1990s, many of which themselves issued securities to public investors. These companies, in turn, spent considerable amounts of the proceeds they raised from their initial public offerings advertising their businesses over the internet. Indeed, AOL's revenue from advertising and commerce transactions (including fees from online transactions) went from virtually nothing in 1995, to more than $2 billion in 2000, approximately one-third of AOL's overall revenue. AOL's advertising department was led by David Colburn, president of AOL's Business Affairs division (which was known within AOL simply as `BA"), Myer Berlow, Eric Kelley and other senior officials many of whom were lawyers; Colbum and Berlow both reported directly to defendant Pittman. AOL's Business Affairs division consisted of approximately 100 officials who focused mainly on advertising and commerce transactions, and was the driving force behind most of the financial transactions — which became known within AOL as "BA Specials" — described below. The BA Specials represented a substantial portion of AOL's advertising revenues, and many of these transactions were entered into near the end of AOL's fiscal quarters, a time when Colburn and other AOL senior executives were usually scrambling to ensure that AOL met or exceeded Wall Street revenue and earnings expectations.

25.     By the late 1990s, a number of the newly-formed, high-tech companies on whom AOL increasingly relied for its own growth could not meet investor expectations and faced financial problems and collapse. As a result, AOL increasingly faced a very serious and growing concern over a key component of its own business — how to maintain and even increase advertising revenue from those same troubled Internet companies. Consequently, AOL began

actively to seek a merger, the currency for which would be AOL stock. Although AOL purported to offer a merger partner an advertising portal with millions of subscribers, its advertising revenues which fueled its fantastic growth were not keeping pace. As a result, AOL engaged in a series of financial and accounting improprieties that inflated artificially its reported advertising revenues and income and, thereby, the price of AOL stock.

### A.  Examples of AOL's and AOLTW's Improper Transactions and Other Accounting Violations

26.    AOL's and AOLTW's financial improprieties took several different — and highly creative — forms. Among others, they included: (a) various types of questionable sham transactions that did not involve AOL earning actual revenues or which involved AOL earning less revenues than it recorded because it used its own money to fund the transactions; (b) misclassifying revenues or receipts from legal disputes as advertising revenue; (c) booking gross revenues from the sale of goods or services where it was acting only as an agent, not as a principal, and therefore was entitled to book only its agreed upon fee, not the gross sale proceeds; (d) counting the repricing of stock and other equity investments as newly earned advertising revenue when such reprising instead merely represented adjustments to the valuation of previously agreed upon transactions; (e) converting one-time contract termination or modification fees into operating ad revenue; and (f) falsely inflating reported revenues and earnings through other types of financial and accounting improprieties.

27.    All of these different types of transactions had in common that they enabled AOL to inflate artificially its reported revenues and earnings in violation of federal and state law and GAAP.[2] These sham and other improper transactions violated GAAP most fundamentally

---

[2]    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. GAAP

(cont'd)

because they lacked or misrepresented the underlying economic substance, thereby permitting AOL and AOLTW to mislead Plaintiffs and other investors by reporting materially inflated revenues and earnings. The materially inflated advertising revenues and earnings which AOL publicly reported to investors differentiated AOL from other Internet companies whose stock prices began to plummet when the Internet bubble burst starting in or around March of 2000.

### i. "Round-Tripping", "Back-to-Back", "Boomerang" and Barter Transactions

28. One principal way by which AOL and AOLTW inflated advertising revenue was through sham sales transactions. These included such things as "round-tripping", "back-to-back", "boomerang", and barter deals, and typically involved the participation of multiple parties engaged in several related transactions. In short, AOL or AOLTW would purport to purchase goods, services, equity or some combination thereof from another party, and simultaneously agree to a reciprocal purchase of AOL's advertising services by that party or some third party. These circular "trades", or "swaps", gave the appearance that AOL and AOLTW had entered into highly profitable, multi-year deals to sell advertising, when in reality these revenues were largely illusory, because AOL and AOLTW had essentially used their own money to fund these deals.

---

(… cont'd)

includes: FASB Statements of Financial Accounting Standards ("FAS"); FASB Interpretations ("FIN"); APB Opinions; American Institute of Certified Public Accountants ("AICPA") Accounting Research Bulletins ("ARB"); AICPA Statements of Position ("SOP"); Consensus Positions of FASB Emerging Issues Task Force (" EITF"); and FASB Concept Statements ("CON"). SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP (with certain exceptions, including that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements). 17 C.F.R. § 201.10-01(a).

29.    One type of sham transaction involved AOL/AOLTW overpaying a second company for the second company's products; the second company, by agreement with AOL/AOLTW, used at least part of the overpayment to buy ads from AOL/AOLTW which it otherwise would not have purchased; and AOL/AOLTW, in turn, booked those dollars as advertising revenue when, in actuality, those dollars were AOL's/AOLTW's to begin with, and therefore were not properly earned under GAAP.

30.    Another variation of such round-tripping involved AOL/AOLTW pre-arranging a round-trip transaction with two other companies.  In these transactions, AOL/AOLTW would agree to overpay Company #2 for goods or services; Company #2 would agree to overpay to buy goods or services from Company #3; and Company #3 would agree to buy advertising from AOL/AOLTW which it otherwise would not have purchased, with the net effect again being that AOL/AOLTW, by virtue of its initial pre-arranged overpayment, essentially bought advertising from itself using its own dollars.  Moreover, in some such cases, AOL/AOLTW received goods and services which were of no value to its businesses whatsoever, but instead were purchased merely to provide third parties with cash which was funneled back to AOL/AOLTW under the guise of ad revenues.  In other instances, AOL/AOLTW received some manner of goods or services of value to their businesses, but the dollars they paid for those goods or services greatly exceeded their market value, again so that those overpaid dollars could be funneled back. Regardless of whether AOL/AOLTW actually provided advertising services to Company #2 or Company #3, the actual economic substance was that AOL/AOLTW used its own dollars to buy advertising from itself. In short, these transactions were shams because they resulted either in no real revenues or gain to AOL/AOLTW or in values far lower than those AOL/AOLTW reported.

31.    In order to comply with GAAP, financial statements must represent the actual underlying economic substance of the information presented.  As noted by the SEC in its

Accounting and Auditing Enforcement Release No. 17, <u>In the Matter of Cypress Bioscience,</u> Inc. and Alex P. De Soto, CPA,, (Sept. 19, 1996): "It is a well-established tenet of GAAP that transactions must be accounted for in accordance with their substance rather than their form.

32.     GAAP (APB 22) also provides that "information about the accounting policies adopted by a reporting entity is essential for financial statement users.  When financial statements are issued purporting to present fairly financial position, changes in financial position, and results of operations in accordance with generally accepted accounting principles, a description of all significant accounting policies of the reporting entity should be included as an integral part of the financial statements."  Further, APB 22 also provides guidance regarding what a company should disclose about its accounting policies.  The SEC has also stated in its Staff Accounting Bulletin No. 101 that accounting policies with regard to barter transactions should be disclosed.

33.     The round-trip and other improper transactions that AOL and AOLTW engaged in violated GAAP because these transactions were neither accounted for nor reported in accordance with their actual underlying economic substance, nor did AOL and AOLTW properly disclose their accounting practices in connection therewith as required by APB 22 and other provisions of GAAP. In addition, these improper transactions also violated SEC Staff Accounting Bulletin No. 101 and several other specific provisions of GAAP including, among other things:

    a.  CON 5, which provides that revenue can be recognized only if it has been "earned", which means that the enterprise must have "substantially ccomplished what it must do to be entitled to the benefits represented by the revenues";

b. CON 2, which provides that to be reliable, financial transactions must be reported on a basis that reflects "representational faithfulness";

c. APB 29, which provides that nonmonetary transactions should be accounted for at fair value of the assets or services involved;

d. EITF 99-17, which provides that exchanges of advertising services between two companies should be accounted for at fair value only if fair value is determinable based on the entity's history of prior transactions and, if not, then "the transaction should be recorded at the carrying amount of the advertising, which likely will be zero";

e. EITF 99-19, which provides that revenue should be recognized in net amounts, not gross, when the recipient is acting as an agent and not as a principal. Where a company is not acting as a principal with its own assets at risk, the company is an agent and may properly recognize revenues only in their net amounts, not their gross amounts;

f. CON 1, which emphasizes the reliance users of financial statements place on information about the enterprise's financial performance;

g. CON 1, which provides that when a company offers securities to the public, it voluntarily accepts wider responsibilities and accountability to investors; and

h. CON 2, *which* mandates that accounting information must be reliable and faithfully "represent[] what it purports to represent."

### a. Homestore, Inc. ("Homestore")

34.    AOL and AOLTW reportedly engaged in at least 16 separate sham transactions with Homestore, a provider of residential real estate listings and related content over the Internet, in the latter part of 2000 and the first half of 2001. These transactions have resulted in an

ongoing criminal investigation and guilty pleas to criminal offenses by seven Homestore executives and SEC charges.

35.    The Homestore transactions were devised and approved, respectively, by AOL/AOLTW employees Kelley and Colburn, who in turn reported to defendants Pittman and Case, and typically involved three elements: first, Homestore paid a third party for services and products that Homestore did not need, and for which it frequently overpaid; second, the third party purchased advertising from AOL/AOLTW with most or all of the overpayment that Homestore made; and third, AOL/AOLTW purchased advertising from Homestore in the same amount or an amount comparable to that which the third party paid to AOL/AOLTW.  The actual net cash and revenue effect to AOL/AOLTW after paying Homestore was zero, but AOL/AOLTW nevertheless recognized the third party's purchases as newly earned revenues when in fact it was AOL/AOLTW's own dollars that funded the transaction from the outset. Pursuant to these arrangements with Homestore, in 2001 alone third parties reportedly paid AOL/AOLTW a total of $45.1 million for advertising, and AOL reportedly funneled these monies back to Homestore aver deducting a "commission" of approximately $9 million. AOL/AOLTW and Homestore reportedly agreed to conceal the third prong of the transaction, but the third party companies who allegedly participated in this round-tripping included PurchasePro, Investor Plus, FX Consultants, Classmates.com, Wizshop and Easy Roomates.

36.    The criminal proceedings resulting in guilty pleas by seven former Homestore executives do not directly identify AOLTW by name, but instead indirectly refer to AOLTW by noting that Homestore engaged in these transactions with a "major media company"; refer to a total of 16 deals; and state that the "major media company" recognized a total of $45.1 million in so-called "revenues" from these round-trip transactions in 2001 alone.  Press reports have identified AOL/AOLTW as the media company, and indicated that former AOLTW employees

Colburn and Kelley, as well as AOL/AOLTW itself, are targets of an ongoing criminal investigation by the DOJ.

37.     Although the Homestore transactions in 2001 involved less than $45 million in allegedly inflated advertising revenues, or only a small percentage of AOL's/AOLTW's overall revenues during this period, complete and accurate disclosure of these transactions was required under GAAP because these transactions were highly material to AOL's/AOLTW's business, financial practices and operating condition and results. According to SEC Staff Accounting Bulletin 99:

> Evaluation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and the staff believes that there are numerous circumstances in which misstatements below 5% could well be material.  Qualitative factors may cause misstatements of quantitatively small amounts to be material; as stated in the auditing literature:
>
> ***
>
> Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are —
>
> •     whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate;
>
> •     whether the misstatement masks a change in earnings or other trends;
>
> •     whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise;
>
> •     whether the misstatement changes a loss into income or vice versa;
>
> •     whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability;
>
> •     whether the misstatement affects the registrant's compliance with regulatory requirements;
>
> •     whether the misstatement affects the registrant's compliance with loan

covenants or other contractual requirements;

- whether the misstatement has the effect of increasing management's compensation - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

- whether the misstatement involves concealment of an unlawful transaction.

* * *

Even though a misstatement of an individual amount may not cause the financial statements taken as a whole to be materially misstated, it may nonetheless, when aggregated with other misstatements, render the financial statements taken as a whole to be materially misleading. Registrants and the auditors of their financial statements accordingly should consider the effect of the misstatement on subtotals or totals. The auditor should aggregate all misstatements that affect each subtotal or total and consider whether the misstatements in the aggregate affect the subtotal or total in a way that causes the registrant's financial statements taken as a whole to be materially misleading,

38.  Further, APB 29 requires that non-monetary transactions be recorded *using fair value; CON* 5 provides that revenue must be properly earned before it can be recognized; and CON 2 requires "representational faithfulness" in the reporting of a company's financial transactions. The Homestore transactions violated OAAP, and particularly APB 29, CON 5 and CON 2, because a material amount of the Homestore transactions was not based on fair value and lacked economic substance, as AOL/AOLTW was merely taking money out of one of its pockets, round-tripping those dollars back to its other pocket, and improperly counting those dollars as newly earned advertising revenue, all of which inflated artificially AOL's/AOLTW's reported revenues and earnings and contributed to AOLTW's subsequent restatement of its 2000-2002 financial results.  In addition, AOL's/AOLTW's accounting for the Homestore transactions also violated APB 22 and AU § 411 (describing concept of "fairness" in the overall presentation

of financial statements), among other GAAP provisions, because AOL's/AOLTW's accounting for those transactions did not present fairly the actual financial position and results of AOL/AOLTW, nor were AOL's/AOLTW's accounting policies and principles sufficiently disclosed to investors in connection therewith.

39.    AOL and Homestore also engaged in a separate sham transaction in May 2000, whereby AOL and Homestore entered into a five-year agreement reportedly worth more than $200 million.  Under the agreement, AOL was to receive about 3.9 million shares of Homestore stock; a guarantee that Homestore's stock would meet certain performance goals; a right to draw upon a $90 million letter of credit issued by Homestore if Homestore stock did not meet the performance guarantee; and $20 million in cash.  In exchange, Homestore became the exclusive distributor of home and real estate content for all of AOL's properties, and AOL created a "House and Home" channel for Homestore on AOL's website. The transaction was structured by AOL's Kelley and Colbum, and Homestore executives Peter Tafeen and Joseph Shew.

40.    Instead of properly recognizing revenue pursuant to the terms of the agreement and accounting for the consideration at fair value and disclosing the transaction as required by APB 29, however, AOL reportedly valued this May 2000 transaction at some $287 million, thereby ignoring the discounts for time value and restrictions on marketability of the Homestore stock it received, and the fact that AOL may have been unable to tap any of the letter of credit if Homestore stock met the parties' performance guarantee.  In addition, AOL did not account for this transaction to reflect its actual economic substance in accordance with CON 2, ¶ 63 and CON 2, ¶ 59, because AOL inflated the value of the consideration which it received from Homestore in this deal.  This also had the effect of artificially increasing the revenues and earnings AOL reported to Plaintiff and other investors, and contributed to AOLTW's subsequent restatement of its financial results.

### b.     Sun Microsystems, Inc. ("Sun")

41.     In the latter part of 1998, AOL announced that it entered into a three-year development and marketing alliance with Sun under which AOL would receive more than $350 million in licensing, marketing and advertising fees.  Reportedly, the transaction also entailed AOL agreeing to buy $500 million in computer equipment from Sun at list price, even though companies such as AOL typically buy at a discount of more than 30 percent -- key facts about the transaction AOL failed to disclose. Put differently, although AOL received computer equipment from Sun, it materially overpaid Sun for that equipment so that Sun would buy AOL advertising.  Absent AOL's original overpayment for the equipment, Sun would not have advertised on AOL.  The net economic effect was that AOL "round-tripped", or received back, a portion of its own original overpayment to Sun, and booked and reported those dollars as newly earned advertising revenue when those dollars instead belonged to AOL to begin with, and therefore did not represent newly earned revenues. AOL and Sun would not have entered into the transaction without the reciprocal purchases.

42.     According to a July 14, 2003 report in Business *Week,* one AOL official admitted that AOL booked revenue from its transactions with Sun that "was fake money".

43.     AOL's accounting for the Sun deal resulted in an overstatement of AOL's revenue and income and violated GAAP, particularly, among other provisions: APB 29, because AOL failed to account for this deal at its fair value; CON S, because at least a material portion of the dollars AOL recorded as advertising revenues were self-generated and therefore not properly earned; and CON 2, because AOL's accounting for this transaction did not reflect its actual economic substance, all of which inflated AOL's reported revenues and earnings and contributed to AOLTW's subsequent restatement of its financial results.

c.    **Veritas Software Corp. ("Veritas")**

44.    Similar to the Sun transaction, AOL negotiated a deal in September 2000 to pay Veritas, a maker of data storage software, $50 million for $30 million worth of software. The extra $20 million was then round-tripped back to AOL through Veritas's "purchase" of online advertising from AOL. AOL, in turn, recognized some or all of that $20 million overpayment as revenues in violation of GAAP, especially CON 5, ¶ 83(b), which requires that revenues must be properly earned in order to be recognized.

45.    Reportedly, a former AOL employee described the Veritas deal as being a "kick-back" arrangement, explaining it came about after AOL's Business Affairs unit raised a "hue and cry" when it heard AOL was planning to make a $30 million purchase from Veritas without getting something in return. Veritas, however, initially said it did not want to advertise on AOL and was not going to pay to do so. Consequently, AOL restructured the deal to raise the contract amount to $50 million, and included the extra $20 million for Veritas to funnel back to AOL for advertising. AOL also allegedly wanted to accelerate the $20 million from Veritas to record it as revenue before year-end 2000, the last quarter before the AOL-TW Merger. A separate contract covering the $20 million advertising arrangement was used in order to conceal the underlying connection between these transactions.

46.    Veritas, for its part, was also anxious to book revenue from its software sales to AOL before the end of 2000. Indeed, according to a Knight Ridder report on November 1 b, 2002, "former Veritas managers said the advertising buy was widely viewed as a quid pro quo for the software sale. They said it was unpopular among sales and marketing employees who did not believe banner ads on AOL would help Veritas reach the key technical decision makers who were its main customers."

47.    AOL's accounting for the Veritas deal resulted in an overstatement of revenue and income and violated GAAP, including particularly APB 29, CON 5 and CON 2, because the so-called advertising dollars Veritas paid to AOL were not properly earned by AOL, but instead represented AOL's own money funneled back to it as a result of its original $20 million overpayment to Veritas in the first place. On November 14, 2002, <u>Reuters</u> indicated that the SEC had subpoenaed Veritas's records relating to its transactions with AOL.  On January 17, 2003, Veritas announced that, as a result of the SEC's investigation, it was restating its financial results for fiscal years 2000 and 2001, and eliminating the $20 million in revenue it previously booked.

### d.    Bertelsmann AG ("Bertelsmann")

48.    In March 2000, AOL and Bertelsmann announced plans to restructure their AOL Europe joint venture, under which AOL would purchase, in two installments, Bertelsmann's 50% interest in AOL Europe for approximately $6.7 billion. Rather than take advantage of the discount being offered by Bertelsmann on the buy-out price if paid in cash, AOL arranged to have Bertelsmann round-trip, or rebate, back to AOL through a purchase of advertising services, some or all of the portion of the buy-out price which would have constituted the discount amount.  This arrangement continued for two years and ultimately resulted in AOL reportedly overstating revenue by up to $400 million. According *to The Wall Street Journal on* March 31, 2003:

> A person familiar *with the* situation said that when Bertelsmann initially asked AOL to be paid in cash for its AOL Europe stake, it had offered a discount on the sale price in exchange. The person said AOL's response was that it wasn't interested in a cash discount, but wanted a bigger ad deal. Bertelsmann accounted for the advertising as a cost of the sale, the person said.

49.     On March 29, 2003, <u>The New York Times</u> reported that "the agreement with Bertelsmann was negotiated at the top levels of both companies", and that "current and former Bertelsmann executives" not only questioned the deal, but were instructed by Bertelsmann's headquarters "to buy online advertising from AOL at inflated prices to fulfill the purchase commitment made as part of the larger transaction."

50.     This transaction violated GAAP, and particularly APB 29, because AOL was obligated to record and report the transaction with Bertelsmann at its fair value, and not record any overpayment as an asset. The fact that Bertelsmann recognized the advertising purchase as a cost of the sale of its interest in AOL Europe further evidences the fact that it was improper for AOL to recognize the entire amount of advertising revenue which AOL did in connection with this transaction. In fact, the SEC has concluded that AOL's accounting for this transaction was improper and, as alleged more fully below, AOLTW has announced that it may have to reverse and restate up to an additional $400 million in revenues in connection therewith.

### e.      Gateway Inc. ("Gateway")

51.     AOL and Gateway entered into a bundling arrangement in late 1999 or early 2000 whereby Gateway agreed to promote AOL's Internet services to Gateway's customers by including free AOL service with purchases of new Gateway computers.  While Gateway would receive a "bounty", or fee, from AOL for each new AOL subscriber, Gateway would also pay AOL a comparable, or even identical, fee for the internet service, the net result being that the transactions lacked underlying economic substance because AOL made no "sale", nor did it actually earn any revenue.  Put differently, Gateway loaded its computers with free AOL internet service; AOL paid Gateway a fee for doing so; Gateway round-tripped back to AOL some or all of the fee AOL originally paid to Gateway; and Gateway's customers received AOL internet service essentially for free for a certain specified period, typically one year.  By doing so,

Gateway was able to sell more computers because free AOL internet service was included for its customers, at least for a certain period.

52.     Similarly, AOL was able to report *both* artificial increases in its internet subscriber base — it counted the buyers of Gateway computers as subscribers regardless of whether the Gateway customer ultimately subscribed to AOL internet service as a paying customer after the first free year — *and* inflated revenues and earnings because it recorded its own dollars as newly earned revenues which Gateway round-tripped back.   AOL improperly recorded the payments it received from Gateway as revenue rather than netting those payments against the amounts it paid to Gateway, and thereby overstated its revenue in violation of GA.AP, particularly CON 5, ¶ 83(b).

53.     On or about April 1, 2003, in response to SEC concerns Gateway publicly announced that it would restate the revenues it previously reported from these transactions.

54.     On November 13, 2003, Gateway resolved the SEC probe into its accounting for these transactions by agreeing to a cease and desist order.   The SEC also announced at this time that it had filed charges against Gateway's former CEO, CFO and Controller in connection with these transactions.   In addition, further details emerged at this time about the transactions. Specifically, the original deal provided that AOL's bounty to Gateway was some *$132-$165* for each Gateway customer that signed up for AOL service.   In turn, Gateway's reciprocal payment to AOL was $219.   However, in July 2000, these payments between AOL and Gateway became identical, with each company agreeing to pay the other $219 for each Gateway purchaser that signed up for AOL service.   Further, in September 2000, the companies allegedly took this sham transaction one step further by accelerating the recognition of their phony revenues to the time of sale of a Gateway computer loaded with the free AOL service, regardless of whether the purchaser ever actually subscribed to AOL's internet service.   The recognition and acceleration

of such phantom revenue represents a fundamental violation of GAAP, including particularly APB 22, CON 5 and CON 2, among other provisions, because those revenues were not properly earned. The Gateway transactions are also reportedly part of the DOD's and SEC's ongoing investigation of AOL/AOLTW.

55.    AOL also improperly accounted for a separate round-trip/barter transaction involving a stock deal it entered into with Gateway on or about October 10, 1999. According to a former AOL employee, the deal "was not arm's length" and was misrepresented by AOL to the marketplace. The deal reportedly involved AOL paying some $800 million to Gateway in exchange for a 4.5% stake in Gateway's stock and warrants. AOL did not disclose that a material aspect of the parties' agreement required Gateway to use at least part of the $800 million to buy advertising and other services from AOL. This was a highly material omission because it concealed the reciprocal nature of the transaction, enabled AOL to report ad revenue it did not earn, and thereby inflated AOL's reported financial results.

56.    Moreover, similar to the Homestore transaction described above, the stock AOL received from Gateway was restricted (i.e., not freely tradeable). Proper valuation of that stock was therefore critical to accurately calculate the amount of advertising revenue AOL could recognize from the Gateway deal. As required by GAAP such as APB 29, the transaction had to be valued at the fair value of the assets swapped, factoring appropriate time value and marketability discounts. In addition to failing to disclose that a portion of its $800 million payment to Gateway would be round-tripped back to AOL under the guise of ad revenues, AOL's failure to discount properly the restricted Gateway stock facilitated AOL's overstatement of advertising revenue that it reported to investors in connection with this deal.

f.    **WorldCom Inc. ("WorldCom")**

57.    Another round-trip/barter deal occurred in July 2001.  WorldCom agreed to buy more than $200 million in advertising from AOLTW, in exchange for AOLTW continuing to utilize WorldCom's telecommunications network.  However, AOLTW failed to disclose that, as an additional and material element of the deal, it had also simultaneously agreed to buy Internet capacity from UUNet, a unit of WorldCom.  Consequently, AOLTW was able to conceal that at least a material amount of revenues it booked from this transaction represented its own original dollars which WorldCom merely round-tripped back to AOLTW from AOLTW's original payments to UUNet.  Moreover, since this transaction involved an exchange of services and capacity, APB 29 and other provisions of GAAP required that AOLTW record the services and capacity it received from WorldCom at fair value. AOLTW overstated advertising revenues by millions of dollars in connection with this transaction because it recorded and reported to investors that the network capacity it received from WorldCom was worth far more than it actually was, and thereby inflated artificially AOLTW's reported revenues and earnings.

58.    At least partially as a result of its accounting for the WorldCom deal, AOLTW was forced subsequently to disclose in its Form 10-Q filed with the SEC on August 14, 2002, amid an investigation by the SEC, that its 2000-2002 revenues were overstated by at least some $49 million, as explained more fully below. Media reports have indicated that a significant portion of that $49 million related specifically to the WorldCom deal.  In addition, it emerged that the WorldCom transaction was negotiated principally by AOL's Colburn and WorldCom's former CFO, Scott Sullivan.  Sullivan was criminally indicted by the DOJ for securities fraud relating to WorldCom, and pled guilty.  More recently, WorldCom's former chief executive officer, Bernard Ebbers, has been convicted of securities fraud relating to WorldCom's accounting practices.

g.    Qwest Communications ("Owest")

59.     AOLTW engaged in back-to-back transactions with Qwest in or about July 2001 pursuant to which AOL reportedly agreed to use Qwest's communications network and to purchase digital subscriber lines and network transport capacity, and Qwest agreed to buy advertising from AOLTW.  In a related round-trip transaction, AOL also agreed to purchase network communication capacity from KPNQwest, a European Qwest affiliate, again in return for which Qwest bought AOL advertising. AOLTW violated GAAP in connection with this swap because it failed to account for it based on the fair value of the assets that were swapped, as required by APB 29.   Instead, AOLTW recorded these swaps at a materially inflated value which, in turn, enabled AOLTW to inflate its ad revenues and earnings by tens of millions of dollars.  On August 23, 2002, The New York Times reported that one of the Qwest transactions also factored into AOLTW's restatement of its 2000-2002 revenues.  The Qwest transactions are also reportedly one of the subjects of the SEC's ongoing investigation of AOLTW's accounting practices.

### h.      Oxygen Media Inc. ("Oxygen")

60.     Another round-trip deal which demonstrated that the improper accounting practices were not confined to AOL but also extended to HTW involved the purchase of stock in Oxygen, a cable-television and online company.  In April 2001, AOLTW invested $30 to *$50* million in Oxygen.  As part of the deal, Oxygen's cable channel would be carried on AOLTW's cable systems, and Oxygen, in turn, would purchase $100 million in advertising from AOLTW, mostly from the AOL division.  One unusual aspect of the transaction was that it did not include AOLTW receiving any cable launch fee — a typical and often substantial fee that cable channels such as Oxygen pay to cable operators such as AOLTW in order to obtain favorable channel positions on cable systems.   In lieu of this fee, Oxygen purportedly agreed to purchase advertising from AOL.  As a result, and contrary to the actual underlying economic substance of

the transaction, AOLTW converted and reclassified as advertising revenue what it should have booked as fees from its cable operations, in violation of APB 22 and CON 2. Although AOLTW received fees from the Oxygen deal, AOLTW's accounting for those fees did not reflect "representational faithfulness" — indeed, it was highly misleading — because the Company merely reclassified and recorded fees attributable to the Company's cable operations as advertising revenue, and thereby created the appearance that AOLTW's ad revenues were growing far greater than they actually were.

61.    According to <u>The Wall Street Journal</u> on August 26, 2002:

> The Oxygen trades were one of the many complex deals that were a way of life at the America Online unit — and many other technology companies — during the boom years. At AOL, these deals sometimes included an investment. Other times, AOL squeezed its suppliers for advertising revenue ....
> "If we're one of *their big* customers, we expect them to be one of our big customers," Robert Pittman, the since-departed chief operating officer, said in an interview last year.

Indeed, the article concluded that "[f]or America Online, investing in companies [such as Oxygen] that then advertised on the Internet service was about as crucial to its growth as taking in oxygen. Literally." Reportedly, another focus of the SEC's investigation of AOLTW includes the Oxygen transactions.

62.    AOLTW violated GAAP because it did not disclose to investors the actual underlying nature and substance of the Oxygen transactions, that it reclassified revenues actually realized by its cable unit and instead recorded and reported them to investors as advertising revenues, and that its AOL subsidiary had been an undisclosed driving force behind the deal. Although the Company actually realized revenues from the transaction, these omissions were highly material because they helped AOLTW artificially inflate and maintain the appearance that its advertising revenues were continuing to grow far more than they actually were.

### i.    PurchasePro.com ("PurchasePro")

63.     According to PurchasePro's SEC Form 10-K for 2000, PurchasePro and AOL entered into a "strategic alliance" in March 2000 for the co-development of technologies. Reportedly, AOL/AOLTW purchased promotional subscriptions for AOL/AOLTW customers for $13.9 million ($4.9 million in 2000 and $9.0 million in 2001), and PurchasePro, in turn, bought advertising from AOL.  In effect, PurchasePro was using AOL's money to "buy" AOL ads, and the "revenues" AOL booked from these transactions were in actuality not earned as required by CON S, ¶ 83(b), but instead self-generated, again in violation of GAAP.

64.     Because AOL exchanged advertising services for PurchasePro's subscriptions, APB 29 required that AOL/AOLTW recognize the advertising revenue in accordance with the fair value of the instruments exchanged (the subscriptions and advertising services).  Further, APB 29 and EITF 99-17 provide that if the fair value of the swapped instruments or services is unable to be determined, then the parties' costs should be used to value the transaction which, in the case of placing and arranging Internet advertising, was minimal to AOL/AOLTW.  By effectively recording the entire amount of the swap as ad revenues at inflated amounts, the PurchasePro deal contributed to inflating AOL's and AOLTW's financial results.  Ultimately, at least one former senior executive of PurchasePro — Jeffrey R. Anderson — pleaded guilty to charges of conspiracy to commit wire fraud in connection with these transactions and was sentenced to nearly three years in prison.

65.     The PurchasePro transaction was reportedly designed by Business Affairs employees Kent Wakeford and Jason Wilt.  Colburn himself personally approved the transaction even though he reportedly labeled it as "science fiction", and actually gave Messrs. Wakeford and Wilt a gold star plaque — known within Business Affairs as a Bammy Award — for their roles in the transaction.  Colburn, Berlow, Keller and other senior level Business Affairs employees were involved in designing, or approved, virtually all of AOL's major advertising and

commerce transactions.  In fact, defendant Pittman reportedly said during a conference call with analysts on January 31, 2001 that "[a]s a matter of fact, on the AOL side, most of the big deals are done at the CEO, CFO level."

### j.    Monster.com ("Monster.com")

66.    A final example of round-tripping is AOL's "in kind" advertising deal with Monster.com in late 1999.  On December 2, 1999, Business Wire reported that AOL announced a four-year, exclusive $100-million relationship to bring Monster.com's career management services "directly to cyberspace's largest consumer audience across seven [AOL] brands." Similar to the PurchasePro deal, however, at least a portion of this transaction was without any underlying economic substance, because AOL and Monster.com essentially agreed to nothing more than exchanging advertisements with each other.  As a result, there was no "real" revenue for AOL to report.  Nevertheless, AOL again improperly recognized and reported to investors material amounts of revenue from this transaction in violation of GAAP, including particularly APB 29 and EITF 99-17, among other provisions.

### ii    "Front Loading" or "Jackpotting" to Record Advertising Revenue

67.    Another category of misleading advertising deals that contributed to artificially inflating AOL's/AOLTW's revenues involved the practice of "front-loading" or "jackpotting", i.e., manipulating the timing of revenue in order to accelerate revenue recognition.  "Jackpotting" referred to AOL's practice of running the same ad multiple times on a single Web page.  By doing so, AOL would book revenue based on such multiple ad display, regardless of whether these revenues actually complied with the terms of its customer agreements.  AOL also engaged in improperly accelerated "ad rotation", whereby it decreased the time period in which a Web page automatically refreshes itself, thereby causing new ads to be placed on customers' Web

pages sooner than the customers had directed; the faster the ad rotation, the more revenues AOL would claim for running the ads. The net effect was that AOL was improperly accelerating revenues in violation of GAAP and in violation of the agreements it had with its customers.

### a.    Catalina Marketing Corporation ("Catalina")

68.    One example of "jackpotting" occurred in the first quarter of 1998, after Catalina signed a $10 million, two-year contract to run supermarket advertising online with AOL. AOL executives ran the ads before they were actually even ready and in advance of the time specified in the parties' contract in order to improperly enable AOL to accelerate revenue. AOL's "jackpotting" of the Catalina ads violated GAAP, and particularly CON 5, ¶ 83, because the "earnings process" had not been completed and AOL had not "substantially accomplished" the substance of the parties' underlying contract, which was to run the ads over two years rather than "jackpot", or complete running those ads, before that contractually-specified time. According to The Washington Post on July 23, 2003, AOL's accounting for the Catalina transaction is also part of the SEC's investigation of AOLTW.

### b.    Telefonica SA ("Telefonica")

69.    Another example of "jackpotting", occurring just prior to the AOL-TW Merger, involved an AOL deal to sell $15 million in online ads to Telefonica, a large Spanish telecommunications company. That deal was part of a "strategic agreement" between AOL and Telefonica Datacorp, the business telecom unit of Telefonica, that was announced on December 19, 2000. Allegedly, AOL ran the Telefonica ads too early in order to book all the ad revenue in the December 2000 quarter in order to facilitate consummation of the Merger, despite the fact that the ads were not ready to be run and were deficient. Subsequently, it was revealed that AOL officials had verbally agreed with Telefonica to continue running the ads for months beyond December, and that this was a key — albeit undisclosed — condition for Telefonica agreeing to

run any ads in the first place. AOL itself effectively admitted to artificially accelerating revenue from this transaction, because it later moved millions of dollars in revenue from this transaction from AOL's December 2000 quarter to the March 2001 quarter, after the AOL-TW Merger was complete.

### iii.    Additional Examples of Other Financial and Accounting Improprieties

70.    AOL and AOLTW also improperly converted money from legal disputes into advertising revenue by demanding that its litigation opponent "purchase" advertising in settlement of a legal dispute. Although AOL/AOLTW received revenue from the settlement of these legal disputes, those revenues were peripheral to AOL's/AOLTW's business, and therefore should have been recorded and reported to investors as one-time receipts, gains or other income under GAAP, such as APB 30 and other provisions, not advertising revenue properly earned in the normal course of AOL's/AOLTW's business. The net effect of these transactions was to mislead investors into believing that AOL's/AOLTW's advertising revenues were qualitatively and quantitatively better than they actually were.

71.    For example, AOL improperly converted into ad revenues a $22.8 mullion arbitration award due from a subsidiary of Wembley PLC. That award was originally secured by MovieFone, an online ticketing firm, in 1998. Following AOL's purchase of MovieFone in 1999, AOL recast that $22.8 million arbitration award into ad revenue by having a Wembley subsidiary agree to "purchase" AOL advertising for its online greyhound racing website, 24dogs.com. In order to justify booking this award as advertising revenue for the quarter ending September 30, 2000, AOL also created and immediately began running advertisements for the 24dogs.com website without Wembley's knowledge, and then engaged in "jackpotting" by running as many as three or four Wembley advertisements on a single webpage.

72.    AOL thus violated GAAP because it misrepresented the underlying substance of the transaction. Although there was an "earnings process" taking place, the actual substance of the transaction involved other income or a non-recurring gain to AOL, not advertising revenue earned in the normal course of AOL's operations.  Among other things, CON 6 and CON 5 require that income from peripheral or incidental transactions be treated as gain rather than revenue if it arises from other than a company's central business operations.  In addition, APB 16 and FAS 141 require that assets of an acquired company such as MovieFone's arbitration award be recorded on the acquiring company's balance sheet as receivables and not later recast as income.  AOL's recasting of such a receivable from a legal dispute into advertising revenue artificially inflated AOL's reported advertising revenue.

73.    In the quarter ending September 30, 2000, AOL also reportedly agreed to settle a legal dispute against Ticketmaster in exchange for Ticketmaster buying $13 million of AOL advertising.  As with the MovieFone arbitration award, APB 30, among other provisions of GAAP, required that the settlement payment from Ticketmaster be recorded as other income and not advertising revenue. As with the MovieFone transaction, however, AOL converted and recorded these payments as normal advertising revenue in violation of GAAP, particularly CON 5 and CON 6.  In fact, according to a June 21, 2003 article in <u>The Times</u> (London), an AOL insider "privately expressed qualms about the legitimacy" of booking the Ticketmaster settlement as advertising revenue.  Another unnamed AOL official is reported to have said that the deal "stinks to high heaven."  Nevertheless, the deal was reportedly approved by AOL's Colburn and others.

74.    AOL also misrepresented the nature of its agency relationship with at least one of its customers, eBay.  AOL acted as an advertising broker for eBay under a July 25, 2001 agreement and improperly booked as its own revenue the gross amount of ad sales that AOL

generated for eBay.  Under GAAP, and particularly APB 22, CON 5 and EITF 99.19, among other provisions, AOL should have instead recognized only the amount of revenue that properly accrued to AOL as a commission from such sales.  According to a July 18, 2003 article in The Washington Post, AOLIAOLTW admitted that "it booked the sale of eBay ads as AOL's own revenue", and said that those revenues totaled $80 million in 2000 and 2401, and $15 million in the first quarter of 2002.  That article also cited internal documents which reportedly confirm AOL's/AOLTW's role in, and accounting treatment for, this transaction.

75.    Another of AOL's misleading practices was to improperly recognize advertising revenue based on the repricing of equity stock rights.  For example, an additional aspect of its March 2000 round-trip transaction with PurchasePro involved AOL distributing software for PurchasePro, in exchange for receiving tens of millions of dollars in PurchasePro performance warrants.  Those warrants essentially gave AOL the right to buy PurchasePro stock for $63.26 per share.  However, PurchasePro later accelerated the vesting schedule for those warrants under a revised agreement with AOL, and dropped the exercise price to $0.01 a share.  That reduction enabled AOL to exercise the warrants at $0.01 per share, and resell them at their market price which AOL did, thereby reportedly generating approximately $30 million in one-time gain for the fiscal quarter ended December 31, 2000.  However, AOL booked the entire $30 million as newly earned advertising revenue.  AOL's accounting for this transaction thereby violated GAAP because under CON 6, AOL should have recognized the repricing of the PurchasePro stock warrants as a gain, and not as advertising revenue.  In fact, according to PurchasePro's founder and CEO, Charles E. Johnson Jr., "[t]he warrants had nothing to do with ad revenue".  Further, AOL was reportedly committed to providing PurchasePro with some $9.5 million in goods and services in exchange for PurchasePro's agreement to revise the exercise price of the warrants, but failed to properly account for those costs and, thereby, further inflated AOL's

operating results for that fiscal quarter. AOL's accounting for this transaction was materially false and misleading because it overstated the gross revenues it actually earned from this transaction, understated AOL's costs, and permitted AOL to misclassify one time gain as operating revenue, all of which thereby created the appearance that AOL's advertising revenues were larger than they actually were.

76.     AOL also falsely inflated revenues by improperly converting contract termination and modification fees into ad revenue. This often occurred where technology companies, especially dot-corns, had long-term advertising agreements with AOL/AOLTW, but were having financial difficulties and were at risk of not fulfilling their contracts. Rather than suing to enforce the contracts — and thus risk exposing the true condition of AOL's advertising business — AOL/AOLTW renegotiated those agreements and required those customers to pay a fee for that contract modification. AOL/AOLTW then improperly classified that fee as part of its normal ongoing reported ad revenues when, in fact, that fee was not received as a continuing part of AOL's/AOLTW's normal business operations, but instead should have been recorded under GAAP as gains or other income and properly disclosed as such.

77.     An example of such improper conversion is the $9.625 million fee paid by Dr.Koop.com ("Dr.Koop"). In July 1999, Dr.Koop entered into an $$9 million, four-year advertising agreement with AOL, and by April 2000, Dr.Koop paid AOL to renegotiate that agreement. According to its 2000 Form 10-K filed with the SEC on April 2, 2001, Dr.Koop gave AOL 3.5 million shares of its common stock in exchange for amending the terms of its original advertising agreement. That stock was valued at approximately $9.6 million and improperly recorded by AOL as advertising revenue.

78.     AOL's/AOLTW's improper conversion of contract termination fees into ad revenues violated GAAP, especially CON 5 and CON 6, because those fees did not represent

advertising revenue properly earned in the Company's normal course of business. In addition, AOL's/AOLTW's accounting for these transactions also violated APB 22 and CON 2, among other GAAP provisions, because the actual underlying economic substance of the conversion and the accounting practices the Company used in connection therewith were not disclosed to investors. Like the MovieFone and Ticketmaster legal settlements, AOL/AOLTW received revenue from these contract termination/modification fee conversions, but those revenues were not received as a continuing part of AOL's/AOLTW's normal business operations. Instead, these fees were typically one-time transactions which should have been recorded under GAAP as gains, or other income, or at a minimum disclosed to investors in accordance with their underlying economic reality and with adequate explanation of the accounting treatment the Company employed.

79.    Another type of transaction which artificially increased AOL's advertising revenues was so-called cross-platforms deals. In essence, AOLTW falsely recasted portions of new deals generated by HTW divisions into including some purchase of advertising from its AOL unit, again in violation of GAAP.

80.    An example of a "cross platform" deal is AOLTW's $200 million advertising deal with Golf Channel, a majority-owned unit of cable giant Comcast Corp. In June 2001, Golf Channel agreed to a five year deal to have its programming shown on Time Warner Cable. However, AOL intervened in order to seek a piece of the deal for itself. Reportedly, AOL successfully pressured Golf Channel into recasting about $15 million of the $200 million deal as online advertising with AOL, which AOL then recognized and falsely reported as advertising revenue. According to The Washington Post, AOL sources acknowledged that Golf Channel was left with "few options", as AOL reportedly told Golf Channel executives "where and when" the ads would run, and that "[t]hey didn't have a choice." Although AOLTW's deal with Golf

Channel involved actual revenues to the Company, it was misleading to account for a material portion of those revenues as AOL advertising dollars when they instead were generated by the Company's cable operations, because such a reclassification falsely portrayed the actual results and operations of AOL's advertising business.

81.    Another example of a "cross platform" deal involved Oxygen Media.   As described above, the Oxygen transaction called for HTW's cable systems to agree to carry Oxygen's cable channel.   Instead of paying a customary cable launch fee, however, Oxygen spent about $100 million in advertising on AOL properties, mostly on its online service, as a result of AOL's insistence that it be permitted to participate in, and record ad revenue from, this transaction.   Thus, AOLTW not only concealed the round-trip nature of the deal (i.e., converting essentially a cable launch fee which should have been recorded by HTW's cable operations into AOL ad revenue), but also omitted to disclose the intra-Company circumstances that led AOLTW to structure the transaction as it did.   Like the Golf Channel deal, Oxygen Media would not have agreed to spend the $100 million on advertising in the absence of AOLTW relinquishing any claim to a cable launch fee, and AOLTW's recognition of that $100 million as AOL's ad revenue was false and misleading and violated GAAP.

82.    Like AOL's/AOLTW's conversion of legal disputes and one-time contract termination/modification fees, these cross-platform deals created the illusion that AOL's/AOLTW's advertising revenue was growing faster than it actually was.   Consequently, AOL's/AOLTW's accounting for these transactions violated GAAP, particularly APB 22 and CON 2, because AOL/AOLTW failed to account for these transactions and disclose them in accordance with their actual underlying economic substance.   AOLTW also failed to accurately disclose its AOL subsidiary's role behind these transactions and that the revenue from these deals was attributable to the Company's cable operations, not AOL's advertising business.   The

net effect of the Company's cross-platform transactions was to inflate AOL's/AOLTW's reported advertising revenues and results.

**B.    AOL's and AOLTW's False and Misleading Financial Reporting**

83.    As a result of the foregoing financial and accounting improprieties, the publicly reported financial reports issued by AOL and AOLTW during the period at least as early as 1998 and continuing through 2002 were materially false and misleading.

84.    For example, on January 27,  AOL issued a press release containing its purported financial results for its fiscal quarter ended December 31, 1998.  Among other things, AOL reported advertising and commerce revenue of $126 million, a 133% increase over the prior year's same quarter; total revenues of $960 million, an increase of 62% over the prior year's same quarter; and net income of $88 million, a 340% increase from the prior year's quarter.  The press release also touted AOL's new "alliance with Sun Microsystems", though it was silent about the round-trip substance of that transaction as described above.  AOL's stock closed that day at $41.38 per share, an increase of more than 6% from the previous day's close.

85.    On February 10, 1999, AOL reiterated those reported results in the Form 10-Q it filed with the SEC.  The Form 10-Q also assured investors that AOL's financials "have been prepared in accordance with [GAAP] for interim financial statements ...."  However, as a result of AOL's ongoing sham transactions and other financial and accounting improprieties, examples of which include the Sun, Catalina and MovieFone transactions described above, AOL knew or recklessly disregarded that this statement was false because it knew, among other things, that its reported results contained artificially inflated revenues and earnings and thereby did not conform to GAAP.

86.    On February 23, 1999, AOL stock split 2-for-1, and its stock closed at $44 per share.

87.    On April 27, 1999, AOL issued a press release containing its financial results for the fiscal quarter ended March 33, 1999, including "new records for total revenues, advertising and commerce revenues ... net income ... and AOL membership growth."   Specifically, AOL reported advertising and commerce revenue of $210 million, an increase of 119% over the prior year's same quarter; an advertising and commerce backlog ¢ of $1.3 billion; total revenues of $1.3 billion; and net income of $117 million.   Again, however, AOL's April 27 press release was false and misleading because it failed to disclose that AOL had been engaging in a number of financial transactions and accounting improprieties the effect of which was to inflate artificially its reported operating revenues and earnings.   That press release was also false and misleading because it failed to disclose that AOL's advertising backlog — which was critically important to investors since it purportedly reflected that AOL's tremendous revenue growth was sustainable and, in turn, helped fuel AOL's rising stock price — was declining in amount and quality due to the failure or perilous nature of increasing numbers of Internet companies which advertised heavily.   In fact, AOL stopped disclosing its advertising and commerce backlog in the quarter ended December 31, 2000, Further, the press release boasted that AOL's reported earnings per share ("EPS",) beat analyst estimates by $0.42, and misleadingly touted AOL's relationship with eBay without disclosing the highly material fact that it had been overstating its revenue from the eBay deal by recording revenues as a principal rather than an agent, as follows:

> AOL also expanded its strategic relationship with eBay, the largest online person-to-person trading community ... [t]hrough a new $75 million, four-year agreement .... AOL will be entitled to all advertising revenues generated by these sites, and may act as the exclusive third-party advertising sales force for advertising sold on eBay's Web site.

88.    On April 28, 1999, <u>Dow Jones News Service</u> commented positively on AOL's financial results, quoting one Internet analyst as saying that AOL's "tremendous" reported

growth in advertising revenue is the driving force behind its earnings model. AOL's stock closed that day at $71.50 per share.

89.    On or about May 7, 1999, AOL filed its Form 10-Q for the fiscal quarter ended March 31, 1999 and reiterated the financial results reported in its April 27, 1999 press release. The Form 10-Q also falsely assured investors that AOL's financial statements "have been prepared in accordance with [GAAP] for interim financial information ..." when, because of AOL's accounting and financial violations, examples of which include the Sun, Catalina and MovieFone transactions described above, those financial statements contained inflated revenues and earnings and therefore did not conform to GAAP.

90.    On July 20, 1999, The Arlington Morning News reported that AOL was expected to earn $0.11 per share for the fiscal year ended June 30, 1999, and that the "whisper" number (i.e., the consensus, "unpublished" wall Street forecast) was EPS of $0.13.  In addition, the article highlighted AOL's growing dependence on advertising revenue, as follows:

> America Online signed scores of large advertising agreements with companies that span several years. In February, for example, it said it signed a five-year agreement worth up to $500 million [to] market credit cards with Bank One Corp.'s First USA unit to AOL subscribers.

> AOL said its backlog of advertising and ecommerce revenue was $1.3 billion at the end of March. The backlog represents the revenue that AOL expects to record in future quarters from its multiyear agreements.

> The company has sought to increase its revenue from marketing alliances and electronic commerce since it shifted to a flat-rate subscription in 1996.

91.    On July 21, 1999, AOL issued a press release to report its financial results for its fiscal quarter and year ended June 30, 1999.  Specifically, AOL reported advertising and

commerce revenue of $233 million for the quarter, an increase of 86% over the previous year's

same quarter; an advertising and commerce backlog of $1.5 billion; total quarterly revenues of S

1.4 billion; net income of $156 million for the quarter and $396 million for the year; and EPS for

the quarter of $0.13.  AOL's July 21 press release was false and misleading because it failed to

disclose, *inter* alia, that AOL had been engaging in financial and accounting improprieties which

inflated artificially AOL's reported revenues and earnings, and that AOL's advertising and

commerce backlog had been deteriorating because of the perilous economic condition of several

of AOL's Internet and technology company advertising clients.  AOL's stock closed that day

(July 21) at $57.53 per share.

92.     On or about August 13, 1999, AOL filed its Form 10-K for the fiscal quarter and

year ended June 30, 1999. The Form l0-K reported the same results set forth in AOL's July 21,

1999 press release, and noted AOL's increasing dependence on advertising revenue, as follows

(emphasis added):

> An important component of the Company's business
> strategy in its Interactive Online Services business is
> an **increasing reliance on advertising**, commerce and
> other revenues. These revenues include advertising and
> electronic commerce fees, the sale of merchandise, as
> well as other revenues....  The growth of advertising,
> commerce and other revenues is important to the
> Company's business objectives, as these revenues
> provide an important contribution to the Company's
> operating results.  Advertising revenues are expected
> to grow in importance as the Company continues to
> leverage its large, active and growing user base.

93.     That Form 10-K also incorporated a July 21, 1999 audit report which falsely

assured investors that AOL's year-end financial statements were audited in accordance with

Generally Accepted Auditing Standards ("GAAS") and complied with GAAP.  Moreover, in

AOL's related 1999 Annual Report to shareholders, defendants Case and Pittman touted the

alleged growth in AOL's ad revenues, misleadingly explaining that during that fiscal year, AOL had signed 58 multi-year ad and commerce agreements each worth in excess of $1 million, and that "America Online has never been stronger". The undisclosed truth, however, was that because of its financial and accounting improprieties, AOL had been inflating artificially its reported revenues and earnings.

94. Further, AOL's fiscal year-end 1999 Form 10-K and related Annual Report also failed to disclose the highly relevant fact that, by this time, internal AOL documents existed which showed that the growth in AOL's advertising business would be materially decreasing, a key fact directly contrary to what AOL had been publicly portraying. Reportedly, these internal AOL documents also indicated that many of the new Internet and technology companies — on which AOL increasingly depended for advertising — were beginning to fail and would continue to fail in even larger numbers in 1999 and beyond. These internal documents reportedly consisted of spreadsheets and memoranda which reflected that as early as the fall of 1999 (when Case first approached defendant Levin about the Merger), the growth of AOL's advertising business would decline in terms of both volume of transactions and overall revenue.

95. On October 19, 1999, <u>Dow Jones News Service</u> reported that "[strong subscriber growth and an increase in advertising and electronic-commerce revenue should help [AOL] beat analysts' expectations for its first fiscal quarter." Accordingly, while analyst consensus estimates were EPS of $0.13 for the quarter ended September 30, 1999, the "whisper" number was EPS of $0.15. AOL stock closed that day at $57.63 per share, up nearly 5% from the previous day's close.

96. On October 20, 1999, AOL issued a press release announcing its financial results for its fiscal quarter ended September 30, 1999, again purportedly "setting new records for consolidated revenues, advertising and commerce revenues, operating income, and membership

growth in the first quarter."  AOL reported advertising, commerce and other revenue of $350 million, double that of the previous year's quarter; advertising and commerce backlog of more than $2 billion; total revenues of $1.5 billion, 47% higher than the previous year; and net income of $184 million and EPS of $0. I 5, up from $50 million and $0.04 over the previous year's quarter.  Defendant Case proclaimed that "[t]his quarter's results clearly demonstrate America Online's leadership and growing earnings power."  However, that press release was materially false and misleading because it failed to disclose, among other things, that AOL had engaged in numerous sham transactions and other financial and accounting violations; that AOL's own internal documents then reflected material weakness in the growth of AOL's advertising business and reported advertising and commerce backlog, highly critical facts given that advertising had quickly become the key to AOL's overall success; and that AOL's reported operating revenues and earnings had been inflated artificially.

97.    Unsurprisingly, analysts responded favorably to these reported results.  For example, on October 21, 1999, PR Newswire quoted E*Offering analyst Andrea Williams as saying that AOL "continues to be the dominant force in interactive media today, with a compelling product offering, a large and loyal customer base, robust advertising, and sponsorship demand.  We believe that AOL remains the company best-positioned for the long term on the Internet."  That same day, AOL stock climbed to $61.13 per share.

98.    On November 2, 1999, AOL filed its Form 10-Q for the fiscal quarter ended September 30, 1999 reiterating the results reported in its October 20, 1999 press release.  The Form 10-Q also assured investors that AOL's financial statements were prepared in accordance with GAAP when, because of AOL's financial and accounting violations, those reports contained artificially inflated revenues and earnings and, therefore, were materially false in violation of GAAP.  That same day (November 2), AOL stock closed at $66.56 per share.

99.    On November 23, 1999, AOL stock split 2-for-1, and the stock closed at $85.00 per share.

100.    Following disclosure of these quarterly results and AOL's November 23 stock split, analysts continued to tout AOL's purportedly impressive growth, especially its reported and projected advertising revenues.  For example, Wit Capital analyst Jordan Rohan rated the stock a "Buy" and explained in a December 8, 1999 Business Wire report that "[w]e have raised our 2001 revenue estimate to $8.2 billion from $7.8 billion based on more accelerated growth in e-commerce and advertising revenues than previously anticipated."  Similarly, on December 17, 1999, Henry Blodget of Merrill Lynch commented favorably on AOL with a heavy focus on AOL's reported growth in ad revenue.  According to Blodget, "investors should focus on AOL's profit growth, not subscriber growth or access pricing.  They should focus on how much advertising and e-commerce revenue AOL will ultimately be able to receive each month from its customers."

101.    By November of 1999, however, it became clear to defendants Case and Pittman and other senior AOL officials that the growth of AOL's advertising and commerce revenue had been significantly slowing, and that AOL's advertising backlog would suffer declines due to the failure of several of AOL's advertising clients.  In particular, a confidential internal report dated November 4, 1999 reportedly reflected that AOL entered into 47 advertising and commerce transactions valued at $694 million during the period July to September 1999, but that during the next three-month period (October - December 1999), AOL had entered into only 14 such transactions valued at $457 million.  Another internal report dated November 10 also reportedly reflected material weakness in AOL's advertising and commerce revenue.  Nevertheless, AOL and defendants Case and Pittman failed to timely and accurately disclose to investors these key facts.

102.    On January 10, 2040, AOL and HTW issued a joint press release announcing that their Boards had unanimously approved their Merger.  That same day, a joint press conference was held to launch the supposed "deal of the century", which included Case, Pittman, Levin and others.  The $350 billion mega-merger was then hailed as a synergistic marriage between the new Internet media of AOL, and the traditional publishing media of HTW.  The proposed Merger was a stock swap in which AOL essentially would buy HTW, with AOL shareholders receiving 1 newly issued share of AOLTW stock for each of their AOL shares, and HTW shareholders receiving 1.5 AOLTW shares for each of their HTW shares.  Although Levin's position throughout the Merger negotiations was reportedly that AOL and HTW shareholders should divide ownership of AOLTW equally, the exchange ratio effectively meant that AOL shareholders would own 55% of AOLTW, and HTW shareholders would own the remaining 45%.  Put differently, AOL would be acquiring HTW.

103.    In response to the Merger announcement, the market price of both companies' stocks and bonds rose significantly, with AOL's stock closing on January 10, 2000 at $72.63 per share.

104.    As reported by <u>The Atlanta Journal and Constitution</u> on January 10, 2000:

> Shares of Time Warner and America Online rose sharply in early trading today after investors moved to capitalize on the companies' planned mega merger.
>
> Time Warner was up more than 50 percent, trading as high as $99 at one point.  The media company closed Friday at $64.75, down $2.18 or 3 percent.
>
> AOL, which closed Friday at $73.75, up $5, was as high as $82 at one point today.
>
> * * *
>
> Bonds of America Online and Time Warner rose today along with the stocks.  Typically, the bonds of an investment-grade company like Time Warner decline on

such news, impaired by the acquiring company's lower
credit rating.   That's not the case here, analysts said,
because AOL has little debt, plenty of cash and, unlike
many other Internet companies, it's profitable.

105.    On January 19, 2000, AOL issued its financial results for the fiscal quarter ended

December 3l, 1999, "setting new records for consolidated revenues, advertising and commerce

revenues, operating income, and quarterly membership growth."   AOL reported advertising,

commerce and other revenue of $437 million, an increase of 79% from the prior year's same

quarter; an advertising and commerce backlog of $2.4 billion; total revenues of $1.6 billion, 41%

higher than the previous year's same quarter; and net income of $224 million.   However, the

press release was false and misleading because it failed to disclose that AOL had been violating

GAAP and inflating its reported operating revenues and earnings.   The press release also

misleadingly stated that AOL completed an agreement with Gateway "to accelerate distribution

of each company's products and services" and that AOL entered into a $l00 million partnership

with Monster.com, but again omitted to disclose the actual underlying economics of those

transactions and AOL's improper accounting practices and GAAP violations regarding them.

AOL's stock closed up that day (January 19) at $64.88 per share. AOL reiterated those same

reported results in its Form 10-Q filed with the SEC on February 14, 2000 which also falsely

assured investors that AOL's financials were prepared in accordance with GAAP.

106.    Predictably, analysts continued to be impressed, particularly with the alleged

growth AOL reported in its ad revenue.   As PaineWebber's James Preissler noted in The Wall

Street Journal on January 20, 2000, "[w]e knew [AOL's ad revenue] was going to be strong, but

it was really, really strong".   Similarly, in a report issued on February 3, 2000, Morgan Stanley,

HTW's financial advisor for the Merger, commented favorably on HTW's reported financial

results for its fourth quarter ended December and on the prospects for the pending Merger.

107.    On February 11, 2000, AOLTW filed its initial registration statement for the AOL-TW Merger, and on May 19, 2000 AOLTW filed the operative Merger Registration Statement which contained the Joint Proxy/Prospectus.  The Joint Proxy/Prospectus for the Merger was sent to shareholders of AOL and HTW on or about May 23, 2000.

108.    The Merger Registration Statement included, among other things: AOL's audited financial results for the fiscal year ended June 30,1999; AOL's unaudited financial results for the nine months ended March 31, 1999 and 2000; the unaudited pro forma consolidated financial results of the proposed combined entity on two different bases (as a result of the fact that AOL then operated on a June 30 fiscal year, while HTW operated on a December 31 calendar year basis), including for the nine months ended March 31, 2000, and the year ended December 31, 1999; and the Merger Agreement.

109.    In §§ 4.1(d) and 4.2(d) of the Merger Agreement, AOL and HTW represented and warranted that their previously issued financial reports were accurate and present [] fairly, in all material respects," the respective financial positions and results of AOL and HTW as of the date of those reports, and further that their respective financial statements conform to GAAP. The Merger Agreement also provided, among other things: that none of the information supplied by AOL and HTW in the Joint Proxy/Prospectus will "contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading" (§§ 4.1(e) and 4.2(e)); that applicable documents which AOL and HTW filed with the SEC complied in all material respects with SEC rules and regulations (§§ 4. 1 (d)(i) and 4.2(d)(i)); that AOL and HTW have not incurred certain previously undisclosed liabilities which would be required to be disclosed under GAAP (§§ 4.1(d)(ii) and 4.2(d)(ii)); that the applicable representations and warranties of AOL and HTW were true and correct through the time of the

Merger (§§ 7.2(a) and 7.3(a)); that the parties could decline to proceed with the Merger if either company's representations and warranties were untrue and would have a "material adverse effect" if the truth was known (§§ 7.2(a), 7.3(a) and 9.11(f)); and that the parties could terminate the Merger under certain conditions (§ 8.1), such as by HTW if AOL "breached or failed to perform any of its representations, warranties, covenants or other agreements contained in the" parties' Merger Agreement (§ 8.1(g)).

110.    The Merger Registration Statement also incorporated by reference, among other things, the following documents:

> i.      AOL's Form 10-K for the fiscal year ended June 30, 1999;
>
> ii.     AOL's Form 10-Q for the quarter ended September 30, 1999;
>
> iii.    AOL's Form 10-Q for the quarter ended December 31, 1999;
>
> iv.     AOL's Form 10-Q/A for the quarter ended March 31, 2004;
>
> v.      several of AOL's Forms 8-K; and
>
> vi.     the Joint Proxy/Prospectus.

111.    The *pro forma* financial statements in the Merger Registration Statement represented that as a result of the Merger, approximately $94.7 billion would be allocated to goodwill due to the excess purchase price over identifiable tangible and intangible assets, and estimated a useful life of 25 years for the goodwill.  Additionally, the Joint Proxy/Prospectus represented that:

> AOL Time Warner will periodically review the carrying value of the acquired goodwill for acquired businesses to determine whether an impairment may exist.  AOL Time Warner will consider relevant cash flow information, including estimated future operating results, trends and other available information, in assessing whether the carrying value of goodwill can be recovered.  If it is determined that the carrying value of goodwill will not be recovered from the undiscounted future cash flows of acquired businesses, the carrying value of such goodwill would

- 50 -

be considered impaired and reduced by a charge to operations in the amount of the impairment.

112.    The Joint Proxy/Prospectus included the following message to shareholders: "The boards of directors of both America Online and Time Warner have approved the merger and recommend that their respective stockholders vote FOR the merger proposal."    This recommendation was included in an accompanying joint letter to AOL and HTW shareholders that was signed by defendant Case and Levin.

113.    The Joint Proxy/Prospectus was false and misleading.  Among other things, the Joint Proxy/Prospectus it omitted to disclose the highly material facts that AOL's reported financial results had been inflated artificially as a result of its financial and accounting violations, and that internal documents had then existed which reflected that AOL's advertising business was not growing as AOL had publicly portrayed.  Further, the Joint Proxy/Prospectus also failed to disclose that a material portion of AOL's reported advertising and other revenues were not properly earned as required by GAAP, but instead were attributable to self-generated financial transactions that resulted in no real revenues to AOL or materially less revenue than AOL had reported to investors, such as in the Sun, Catalina, MovieFone and Gateway transactions described earlier.

114.    On February 11, 2000, AOL filed a Form 8-K that incorporated AOLTW's *pro forma* consolidated condensed financial statements for the three months ended September 30, 1999, the fiscal year ended June 30, 1999, the nine months ended September 30, 1999, and the year ended December 31, 1998.

115.    On April 3, 2000, AOL filed a Form 8-K that incorporated AOLTW's *pro forma* consolidated condensed financial statements for the six months ended December 31, 1999, the fiscal year ended June 30, 1999, and the year ended December 31, 1999.

116.    On April 18, 2000, AOL issued a press release containing its financial results for the fiscal quarter ended March 31, 2000, and announced that it "reach[ed] new highs for consolidated revenues, advertising and commerce revenues, operating income, and EBITDA." AOL reported advertising, commerce and other revenue of $557 million, an increase of 103% from the previous year's same quarter; an advertising and commerce backlog of $2.7 billion; total revenues of $1.8 billion, 47% higher than the prior year's same quarter; net income of $438 million; and EPS of $0.17.    Again, however, AOL failed to disclose that it had engaged in a series of financial transactions in violation of GAAP which artificially inflated its revenues, and that its advertising business had materially deteriorated.    The press release also misleadingly cited AOL's transaction with PurchasePro, again without revealing the actual underlying economics of that transaction and AOL's improper accounting treatment of it.    Defendant Case stated that "[t]his quarter's results underscore the tremendous strength of America Online's operations, and demonstrate that we are on a clear path to continued strong growth and increased profitability. Since we announced our landmark merger with Time Warner, we haven't missed a beat."    In addition, defendant Pittman added that "[w]e're taking online advertising and commerce to new heights, yet we've barely scratched the surface in terms of the impact our medium can have."  Kelly stated in a conference call with analysts that same day that "this is the best quarter in AOL's history", and that "we continue to see strong, underlying fundamentals in each of our operations..."

117.    AOL's April 18, 2000 press release was included in its Form 8-K filed with the SEC on April 2l, 2000.  A Dow Jones News Service report that same day confirmed that AOL's reported results had "soundly beat analysts' earnings expectations."

118.    Analysts again lauded AOL's reported results. For example, according to an April 19, 2000 report in TheStreet.com, ING Barings analyst Youssef H. Squall reiterated a "Buy"

rating on the stock, noting that it was his "top pick for 2000" with a 12 month price target of $90 per share. SG Cowen analyst Scott Reamer said in that same report that AOLTW stock was trading "at a bargain basement price".

119.    On May 15 and 17, 2000, respectively, AOL filed its Forms 14-Q and 10-Q/A for the fiscal quarter ended March 31, 2000. Both flings contained substantially the same financial information as reported in AOL's April 18, 2000 press release, and both falsely assured investors that AOL's financials statements conformed to GAAP when, as a result of its financial and accounting violations, those results included revenues and earnings which AOL had inflated artificially.

120.    Unaware of the truth concerning the actual state of AOL's financial condition, operating results and accounting violations, the shareholders of both AOL and HTW voted to approve the Merger on June 23, 2000. That same day, AOL and HTW issued a joint press release announcing shareholder approval of the Merger. AOL's stock closed that day at $53.50 per share.

121.    On June 27, 2000, AOL's financial advisor for the Merger, Salomon Smith Barney, issued a report touting AOL's financial operations and results and deeming AOL "the definitive global online company ...". That report also stated that "[t]he AOL Time Warner merger will be an attractive place to invest in high-quality, free cash-flow growth among the stock market's existing leadership."

122.    On July 6, 2000, Dow Jones News Service reported that AOL was expecting another record-breaking quarter despite a collapsing Internet advertising market, as follows:

> Many smaller Internet companies ran into cash problems during the quarter ended June 30, causing them to cut back on advertising spending. In turn, this had a domino effect on other Internet companies, in particular those that collect the bulk of their

revenue by selling advertising on their web sites.

123.    In fact, AOL continued to lead analysts and investors to believe that it would be able to absorb the lost business from struggling "dot-corn" firms by saying that it had a large and diversified portfolio of ad customers. For example, on July 19, 2000, <u>Dow Jones News Service</u> reported that AOL was expected to "continue its lengthy streak of beating analysts' expectations" when it posts its financial results for the quarter ending June 30, 2000, and that those results would be "[b]uoyed by strong advertising and electronic-commerce revenue".  The article noted that AOL appeared to buck the trend in a weak advertising market:

> The demise or near-demise of smaller Internet companies prompted many of them to slash their online advertising budgets.  But top Web site operators like America Online were mostly immune to the crunch....

124.    On July 20, 2000, ADL issued a press release containing its financial results for its fiscal quarter and year ended June 30, 2000, claiming that it achieved "new highs for consolidated revenues, advertising, commerce and other revenues, operating income, EBITDA and AOL membership growth."  AOL reported advertising, commerce and other revenue of $609 million for the quarter, an increase of 95% from the prior year's same quarter; an advertising and commerce backlog of $3.0 billion; total quarterly revenues of $1.9 billion, or 39% higher than the prior year's same quarter; net quarterly and yearly income of, respectively, $334 million and $1 billion; and EPS for the year of $4.40.  Defendant Case stated that "[ajs this quarter's results demonstrate, even as we work diligently to ensure that the merger continues to proceed smoothly, we are committed to delivering outstanding performance."  Defendant Pittman stated that "we are continuing to drive up our advertising and e-commerce revenues through an increasing number of partnerships with leading brands and retailers."  Those results were reiterated in AOL's Forms 10-K and 10-K/A filed, respectively, on September 22, 2000 and

October 30, 2000, both of which falsely represented to investors that AOL's financials statements complied with GAAP.

125.    In an interview with <u>Dow Jones News Service</u> on July 20, 2000, defendant Case stated that all of AOL's "numbers were at or above consensus estimates", and that AOL's results were attributable to "strong advertising and electronic-commerce revenue, a development that should reassure investors who had feared a dot-com shakeout would hurt the online advertising market." Defendant Pittman also stated then that advertising and commerce revenue was AOL's "fastest growing revenue stream" and that AOL "reached all time highs in advertising, commerce and other revenue for the [fiscal] fourth quarter and for the full [fiscal] year ...". Kelly added that "we actively monitor and manage" AOL's advertising backlog and "continue to have a very high confidence level in it."

126.    AOL's July 20, 2000 press release and the related comments by Kelly and defendants Case and Pittman were materially misleading because they failed to disclose the truth that AOL had been engaging in financial and accounting violations the effect of which was to increase artificially AOL's reported revenues and earnings. Further, that press release and the related comments of Case, Pittman, and Kelly were also false and misleading because they portrayed AOL's advertising business as growing far more than it actually was, and contrary to that which had been reflected in internal AOL documents. In fact, it had been noted in internal AOL documents and become abundantly clear to AOL's management by this time that the growth of AOL's advertising business — and, hence, of AOL itself — would rapidly decline or even be reversed amid an overall drop in electronic commerce and the failure of many Internet start-up companies on whom AOL's growth depended. AOL's stock closed that day (July 20) at $59.13 per share.

127.    Indeed, by September 2000, additional internal AOL documents confirmed what AOL had known at least as early as 1999 — namely, that it faced a growing risk of declining ad revenue, especially for the 2001 fiscal year, due in part to the failure of many dot-corn companies.  For example, additional internal AOL reports in August 2000 reportedly indicated that Living.com, an online furniture business, BigEdge.com, an online sporting goods retailer, and Owners.com, an online real estate broker, all needed to either restructure their advertising transactions with AOL or risk defaulting.  Further, by September 2000, another internal report initially forecasted that AOL would reportedly lose some $108 million in ad revenues for that fiscal year; subsequently, another report indicated that those expected losses would increase to $140 million.  Reportedly, Robert O'Connor, a finance executive in AOL's Business Affairs division, warned defendant Pittman and other top AOL executives of the increasing and serious risks presented by the many failing Internet companies that had advertising contracts with AOL. AOL reportedly considered suing the failing dot-corn companies, but allegedly chose not to do so to keep concealed the deteriorating performance of AOL's advertising business.  Defendant Pittman was also told of the problems in AOL's advertising business by senior Business Affairs official Myer Berlow and others during a meeting of top AOL executives in early October 2000. In fact, beginning at least as early as the Fall of 2000, AOL began convening a weekly meeting of its Operating Committee, which consisted of Case, Pittman, Kelly and other senior AOL officials including Colbum and Berlow from Business Affairs, to discuss the deteriorating condition of AOL's advertising business.  Colbum and Berlow also reportedly began by this time to convene emergency meetings within the Business Affairs division to discuss this critical issue.

128.    AOL did not timely or accurately disclose any of this highly material, adverse information about the slowing growth and declining condition of its advertising and commerce business, nor did it disclose even that AOL's senior management had begun convening regular

internal meetings to address the issue.  In fact, throughout this time and beyond, AOL continued to portray its advertising and overall revenues as growing unabated.  For example, on October 18, 2000, Dow Jones News Service reported that AOL was expected to meet, and possibly beat, analyst EPS estimates of $0.13 for the quarter ended September 30, 2000.  That same day, AOL issued a press release reporting its financial results for that quarter, "reaching new highs for consolidated revenues, advertising, commerce and other revenues, operating income, EBITDA and first-quarter AOL membership growth."  Specifically, AOL reported advertising, commerce and other revenue of $649 million, an increase of 80% from the prior year's same quarter; an advertising and commerce backlog of $3.0 billion; total revenues of $2.0 billion, or 34% higher than the prior year's same quarter; net income of $350 million; and EPS of $0.14.  Significantly, these were AOL's last publicly reported quarterly results before consummation of the AOL-TW Merger.  Defendant Pittman was quoted as saying that "[o]ur distinctive strategy of focusing on large strategic marketing agreements with major mainstream companies is paying off in the continuing strength of our advertising and commerce revenues, which will substantially benefit from the merger."

129.   Also on October 18, 2000, AOL management held a conference call with analysts.  When asked whether AOL was being affected by an industry-wide slowdown in advertising revenue, defendant Pittman said "I don't see it and I don't buy it."  Similarly, defendant Case misleadingly said that "AOL's advertising growth is right on target....  The current advertising environment benefits us because it will drive a flight to quality."  Kelly falsely stated that AOL's advertising and commerce revenue growth was "very healthy" adding that, "I can't say that strongly enough."  AOL's October 18 press release and analyst conference call came one week after the stock price of Yahoo, Inc., one of AOL's then chief competitors, dropped more than 20% when that company disclosed that its online advertising business had

- 57 -

slowed. However, AOL knew that if it disclosed the same truth, the Merger would be in jeopardy. Thus, the defendants continued to deny that the industry downturn would negatively impact AOL's advertising business, and continued to portray AOL's operations and results as being uniformly positive. Indeed, these defendants' October 18 statements had the desired effect, because in contrast to Yahoo's stock drop the week before, AOL's stock closed that day (October 18) at $46.91 per share, a jump of more than 7% from the previous day's close.

130. AOL's October 18, 2004 press release and the related statements of Pittman, Case, and Kelly were false and misleading because, among other things, they portrayed that AOL's advertising revenues were continuing to grow far more than they actually were and when, in fact, internal AOL documents had then existed which reflected that AOL's advertising revenues would decline significantly, including one internal report which showed that such revenues would decline specifically by some $140 million. Further, AOL's October 18, 2004 press release also failed to disclose that AOL had been engaging in a number of financial transactions and accounting practices which concealed and misrepresented the deteriorating condition of AOL's advertising business, and which inflated artificially AOL's reported revenues and earnings, among other things.

131. Subsequently, AOLTW itself admitted that the reported financial results set forth in its October 18, 2000 press release were false because it restated them to reverse and eliminate some $66 million in revenues for this critically important quarter — the last before the Merger closed. In fact, although AOL's reported results had also been inflated long before this reporting period, AOLTW's subsequent restatement is effectively an admission that AOL's previously reported financial results for at least as early as the fiscal quarter ended September 30, 2000 were materially false, as set forth in APB 20 and explained more fully below.

132.    Unaware of the truth concerning AOL's actual financial performance and the fact that its reported operating results were materially inflated and would later be restated, the market responded favorably to AOL's October 18 press release and management's accompanying conference call with analysts.  For example, Christopher Dixon of PaineWebber stated at this time that AOL's strong advertising and commerce revenue "should alleviate some concerns about the health of the Internet advertising environment"; and ING Barings analyst Squali reiterated a "strong buy" rating on AOL based on its "[s]olid advertising revenues".

133.    On November 9, 2000, AOL filed with the SEC its Form 10-Q for the quarter ended September 30, 2000.  That Form 10-Q reiterated the financial results AOL reported to investors in its October 18, 2000 press release; omitted to disclose the highly material facts that AOL's advertising business had been declining and that AOL had engaged in a number of financial and accounting practices that inflated artificially its revenues and earnings; and contained reported financial results which AOLTW subsequently admitted were false because the Company reversed and restated them.

134.    On December 28, 2000, AOLTW fled its Supplemental Registration Statement with the SEC to register 94,790,746 additional shares of stock for issuance to AOL and HTW shareholders in the Merger.  The Supplemental Registration Statement incorporated by reference the contents of the Merger Registration Statement, including AOL's/AOLTW's financial reports and statements set forth therein, and other documents.

135.    On January 11, 2001 — precisely one year and one day after AOL and HTW jointly announced that their Boards had approved the Merger — the AOL-TW Merger was consummated, with AOLTW becoming the parent entity, and AOL and HTW becoming wholly-owned subsidiaries.  That day, AOLTW's stock closed at $47.23.  The total merger consideration

was reportedly $350 billion based on the 1-for-1 per AOL share, and 1-for-1.5 per HTW share, exchange ratios.

136.    The following day, The Wall Street Journal reported that AOLTW reaffirmed its financial forecasts calling for revenue to grow by 12% to 15% to more than $40 billion in 2001, and for EBITDA to rise about 30%, to $11 billion.  Kelly misleadingly stated that AOLTW "had always planned to aggressively look for cost savings and ways to generate extra revenue", and that advertising and e-commerce "would be our fastest-growing revenue component."  That same day (January 12), Levin was quoted in a television interview as stating that he was "more confident today than [he] was on January loth in 2000" when the Merger was first announced. defendant Pittman was also quoted in a television interview that same day as again denying that AOL/AOLTW would suffer at all from any general advertising industry downturn.  In fact, on January 13, 2001, The Los Angeles Times quoted defendant Pittman as saying that, "[i]n the advertising world, you hear people say there's a slowdown.  But it's not across the board...."

137.    The foregoing statements of AOLTW, Levin, Pittman, and Kelly on January 12 and 13, 2001 were materially false and misleading because they did not accurately reflect the truth about AOL's/AOLTW's financial operations and position.  Among other things, the defendants knew or should have known by this time that AOL's advertising business had not been growing as portrayed and as internal AOL documents confirmed, that AOL had been violating GAAP and inflating its reported revenues and earnings, and that AOL's/AOLTW's advertising business had been suffering significant declines and was in a deteriorating condition. Nevertheless, the defendants not only failed to disclose these key facts, but also falsely portrayed the Company's financial operations, position and advertising business as being uniformly healthy and growing.

138.    On January 26, 2001, AOLTW filed a Form 8-K which incorporated AOL's balance sheets as of June 30 and September 30, 2000 and AOL's income statements for the three months ended September 30, 1999 and 2000, certain of which AOLTW later effectively admitted were materially false because it subsequently restated them as alleged more fully below.  Also that day, AOLTW filed a Form 8-K/A that incorporated AOLTW's *pro forma* consolidated balance sheet as of September 30, 2000 and *pro forma* consolidated condensed income statements for the three and nine months ended September 30, 2000, and for the years ended June 30, 2000 and December 31, 1999, certain of which also included results that AOLTW subsequently admitted were effectively false because it restated them as described more fully below.

139.    On January 31, 2001, AOLTW issued a press release containing its financial results for the fiscal quarter ended December 31, 2000, its first financial results since the Merger was completed.  At that time, AOLTW announced "all-time records in [AOL'sI revenues, advertising, commerce and other revenues, operating income, EBITDA and AOL membership growth."  The Company reported AOL advertising and commerce revenue of $686 million, a 71% increase over the prior year's quarter; AOL total revenues of $2.1 billion; and AOL net income of $365 million, a 67% increase.  The press release also reported AOLTW's *pro forma* 2000 revenues of $36.2 billion, total EBITDA of $8.4 billion, and total EPS of $0.94.

140.    That same day (January 31) <u>Dow Jones News Service</u> commented favorably on AOL's strong financial results, and specifically highlighted AOL's growing advertising and commerce revenue in an otherwise depressed market.  Defendant Pittman was again quoted as indicating that AOLTW would prosper even amid a soft ad market and a broader economic slowdown. Kelly reiterated AOLTW's 2001 growth targets of expected revenues of $40 billion and EBITDA to rise about 30%, to $11 billion, and stated that "[s]trong growth in subscription

and advertising revenues will drive [AOLTW's] performance". Levin was quoted as being "very comfortable with" the Company's growth targets.

141.    AOLTW's January 31, 2001 press release and the related statements of Levin, Pittman and Kelly that day were false and misleading because they did not accurately reflect AOL's/AOLTW's actual operations and financial position. Instead, the defendants failed to disclose the true facts which were, among other things: that AOL/AOLTW had been engaging in several sham and other improper financial transactions and accounting violations additional examples of which include the Homestore, Veritas, Gateway and other transactions described above; that AOL's/AOLTW's advertising revenues had not been growing as much as portrayed; that AOL's/AOLTW's reported financial results materially overstated the Company's revenues and earnings in violation of GAAP, and would have to be restated; and that AOLTW not only could not meet the financial targets it set for the Merger, but also that it would be forced to restate its financial results and take among the largest write-offs in corporate history. AOLTW subsequently admitted that the financial results reported in its January 31, 2001 press release were false and misleading because it restated those results, as described more fully below.

142.    On February 1, 2001, The Los Angeles Times reported that AOLTW was again assuring the investment community that the newly merged Company was on track to meet its financial targets despite a general economic downturn, as follows:

> AOL Time Warner tried to reassure Wall Street on Wednesday that the newly merged company — fueled largely by its fast-growing America online unit — remains on track to meet its financial targets, despite a slowing economy and softening advertising market.

143.    On February 13, 2001, Dow Jones News Service quoted Kelly as stating that "the AOL side of the business would be the `catalyst' for change across the whole company", and that

he still expected "the fastest-growing segment of [AOLTW's] business to be advertising and commerce revenue."

144.    On February 27, 2001, Lehman Brothers reiterated its "Buy" rating on AOLTW stock.

145.    On March 8, 2001, <u>Dow Jones News Service</u> reported that several of AOLTW's top officers were continuing to downplay the increasing weakness in the general advertising market, as follows:

> Despite increasing signs of a weak advertising market, AOL Time Warner Inc. (AOL) Chief Operating Officer Bob Pittman reaffirmed the company's ambitious financial targets for 2001.
>
> Speaking at the Merrill Lynch Internet Conference [in New York today], Pittman put it bluntly: "our businesses are doing great."
>
> ***
>
> "I want to assure you we gave The Street our guidance in January and we are sticking to it. Period," he said.

146.    On March 14, 2001, Merrill Lynch analyst Blodget said that "AOL is the least exposed to the weakness in advertising demand, and continues to sign large cross platform advertising deals with traditional advertisers."   On March 23, 2001, UBS Warburg analyst Christopher Dixon reiterated his "Strong Buy" rating on AOLTW stock.

147.    On March 27, 2001, AOLTW filed a Form l0-K that covered the transition period from July 1, 2000 to December 31, 2000 which contained substantially the same financial information as the Company's January 31, 2001 press release.  That Form 10-K included AOL's financial statements for the three calendar years ending December 31, 2000, and stated that AOL advertising and commerce revenue was $1.3 billion for that transition period and $2.4 billion for the year, a 91% increase.  Starting with that Form 10-K, the Company discontinued reporting its

advertising and commerce backlog. That same day (March 27, 2001), AOLTW's stock closed at $43 per share.

148. The market responded favorably to AOLTW's assurances that it was on track to meet its financial projections. For example, an April 2, 2001 article in The Wall Street Journal credited the Company's purported adherence to its aggressive financial goals, as follows:

> In a rocky stock market, [AOL Time Warner] is one of few big companies whose stock has shown a sharp gain so far this year, partly because it has stuck by aggressive revenue and earnings targets. The newly merged company, facing a weakening economy, is pulling out all the stops to meet its original forecasts for 2041: 12% to 15% growth in revenue, to $40 billion, and a 30% increase in earnings before interest, taxes, depreciation and amortization, to $11 billion. The company says not to worry, and many analysts and investors are confident it will deliver.

Similarly, analysts were led to express confidence in the Company. For example, on April 16, 2001, JP Morgan analyst Paul Noglows reiterated his "Buy" rating on AOLTW stock, and on April 18, 2001, analysts Suzanne Betts and Jeffrey Pittsburg of Pittsburg Institutional reiterated their "Buy" rating on the stock, with a price target of $65 per share.

149. On April 18, 2001, AOLTW issued a press release containing its financial results for the fiscal quarter ended March 31, 2001. The press release stated the Company "post[ed] strong gains in total revenues, EBITDA, cash earnings per share, and Free Cash Flow over pro forma results from last year's comparable quarter." Specifically, the Company reported AOL advertising and commerce revenue of $721 million, a 37% increase over the prior year's quarter; AOL total revenues of $2.1 billion; and AOL EBITDA of $684 million, an increase of 35%. The press release also reported AOLTW's total quarterly revenues of $9.1 billion, EBITDA of $2.1

billion, and EPS of $0.23. Levin was quoted as saying that AOLTW's "results met or exceeded all key operating and financial targets."

150.    AOLTW's April 18, 2001 press release was false and misleading because, among other things, it failed to disclose that the Company had been engaging in financial and accounting violations that inflated artificially its reported financial results. AOLTW subsequently admitted that the financial results it reported in this press release were materially false and misleading, because it restated those results as set forth more fully below.

151.    On April 19, 2001, Lehman Brothers reiterated its "Buy" rating on AOLTW's stock, stating they "were pleasantly surprised by the strength of the quarter as well as management's continued insistence on achieving ... exceptional growth targets for the year ... Favorable reports were also issued by other analysts around this time. AOLTW's stock closed that day at $49.90 per share.

152.    On April 19, 2001, The Los Angeles Times reported in an article titled "Company Town; AOL Time Warner Restores Confidence with Strong First-Quarter Earnings", that AOLTW "delivered surprisingly solid earnings Wednesday [April 18] to a wary Wall Street, putting to rest — for now — doubts about the media and entertainment giant's ability to hit its financial targets amid the advertising slowdown." The article attributed that strong performance in part to AOL's continuing growth in advertising revenues, as follows:

> The strong showing was in sharp contrast to those of other Internet and media companies, which have disappointed investors in recent weeks with rising losses and falling sales. Last week, Yahoo Inc. said it would fire 12% of its work force and report an $11.5-million first-quarter loss.
>
> ***
>
> Advertising and e-commerce revenue — a trouble spot at many Internet companies — rose 10% during the quarter, thanks largely to increases at the flagship AOL

Internet service and the Time Warner cable business.

153.    On May 15 and 16, 2001, respectively, AOLTW filed its Forms 10-Q and 10-Q/A for the fiscal quarter ended March 31, 2001.  The Forms 10-Q and 10-Q/A contained substantially the same financial information as in the Company's April 18, 2001 press release, including that AOL's advertising and commerce revenues had increased 37%.  The Forms 10-Q and l0-Q/A also assured investors that the Company's financial results were prepared in accordance with GAAP when, in fact, AOLTW subsequently admitted that those results did not conform to GAAP because the Company restated them.  On May 16, 2001, AOLTW's stock closed at $53.04 per share.

154.    On June 20, 2001, <u>The Wall Street Journal</u> reported that AOLTW had investigated the propriety of certain of its advertising deals with PurchasePro.  Although one of AOLTW's employees was disciplined as a result, the Company continued even at this time to reassure investors that its accounting was wholly proper when it knew the opposite was true, as follows (emphasis added):

> America Online suspended top deal maker Eric Kelley as part of an investigation into the company's involvement with PurchasePro.com Inc.  Mr. Kelley is a senior vice president for business affairs at America Online, a unit of New York's AOL Time Warner Inc. He runs a team of negotiators who hammer out deals such as the one with PurchasePro, a start-up business-to-business software firm that this past year agreed to pay America Online $50 million for a marketing agreement and $20 million for a software agreement. America Online owns 5.7% of PurchasePro, Las Vegas, and is entitled to a cut of PurchasePro's software revenue....  **An America Online spokesman said, "All revenues related to PurchasePro have been accounted for appropriately and accurately by AOL."**

AOLTW's stock closed that day at $52.80 per share.

155.    On July 18, 2001, AOLTW issued a press release announcing its financial results for the quarter ended June 30, 2001.  The Company reported AOL advertising and commerce revenue of $706 million, a 26% increase over the prior year's quarter; AOL total revenues of $2.14 billion; and AOL EBITDA of $801 million, an increase of 37%, allegedly due to in part to "higher advertising and commerce revenues".  The press release also reported total Company revenues of $9.2 billion, EBITDA of $2.54 billion, and EFS of $0.32.  CEO Levin was quoted as saying that "[o]ur record results are further proof that we are delivering on the promise of the AOL Time Warner merger."

156.    Also on July 18, 2001, <u>Dow Jones News Service</u> reported that AOLTW was adhering to its ambitious financial forecasts for 2001, projecting EBITDA of $11 billion on revenue of $40 billion.  CEO Levin was quoted as saying that AOL's latest quarterly results are "proof positive that the [AOL-TWJ merger is working."  The Company's stock closed that day at $44.65 per share.

157.    AOLTW's July 18, 2001 press release and Levin's accompanying statements were false and misleading because they omitted to disclose that AOL/AOLTW had been engaging in a number of financial and accounting violations which inflated artificially AOL's/AOLTW's reported revenues and earnings.  AOLTW subsequently admitted that the financial results contained in that press release were materially false and misleading because it restated them as described more fully below.

158.    On or about August 14, 2001, AOLTW filed its Form 10-Q for the quarter ended June 30, 2001.  That Form 10-Q contained substantially the same financial information as the Company's July 18, 2001 press release, and again falsely assured investors that the Company's

financials were prepared in accordance with GAAP when, in fact, AOLTW subsequently restated those results. AOLTW stock closed that day at just under $40 per share.

159. In a September 24, 2001 Dow Jones News Service report, AOLTW first acknowledged that a general slowdown in the advertising market was effecting the Company, but falsely attributed that "slowdown" to the 9/11 terrorist attacks, as follows:

> For more than 18 months, executives from AOL and its predecessor companies, America Online, Inc. and Time Warner Inc., had insisted the merged entity would post cash flow growth of 3O% and revenue growth of more than 10%. The projections were among the proposed merger's selling points to Wall Street.
>
> But AOL said late Monday its cash flow growth in 2001 will be in the 20% range and revenue growth between 5% and 7%. AOL cited the [9/11 Terrorist] attacks and the advertising market slowdown, becoming the latest company to sound a note of caution in the wake of the attacks....
>
> While many analysts had lowered their AOL estimates in recent weeks, some were surprised by the magnitude of the expected shortfall.... "These numbers are lower than what we had been projecting," said CIBC World Markets analyst John Corcoran. "The magnitude of the shortfall might surprise the Street."

The Company made no disclosure of the fact that its growth in advertising revenue had already long been declining, nor that it and AOL had long been engaging in a series of sham and other improper financial transactions and accounting violations specific examples of which are detailed above. That same day, AOLTW's stock price increased more than 8% from the previous day's close, to over $32 per share.

160. On October 17, 2001, the Company issued a press release containing its financial results for the quarter ended September 30, 2001, reporting AOL advertising and commerce revenue of $624 million, a 5% increase over the previous year's quarter; AOL total revenues of

$2.2 billion; and AOL EBITDA of $742 million.  That press release was false and misleading because it omitted to disclose that AOL/AOLTW had violated GAAP and inflated its reported revenues and earnings.  In addition, the press release also contained the misleading and highly ambiguous statement that the growth in AOL's overall revenue was "driven by a 7% increase in advertising, including contract settlements and intercompany revenues".  The press release reported total Company revenues of $9.3 billion, EBITDA of $2.5 billion and EPS of $0.30, excluding merger-related costs and certain one-time items.  Those results were reiterated in AOL's Form 10-Q filed with the SEC on November 14, 2001; that Form 10-Q also falsely assured investors that AOL's financials were prepared in accordance with GAAP when, in fact, AOLTW subsequently restated those results.

161.    On January 30, 2002, AOLTW issued a press release of its financial results for the fiscal quarter and year ended December 31, 2001, reporting AOL advertising and commerce revenue of $637 million for the quarter and $2.7 billion for the year, a 13% increase over the prior year; AOL total revenues of $2.3 billion for the quarter and $8.7 billion for the year; and AOL EBITDA of $718 million for the quarter and $2.9 billion for the year.  The press release also reported total Company revenues of $10.6 billion for the quarter and $38.2 billion for the year; EBITDA of $2.8 billion for the quarter and $9.9 billion for the year; and EPS of $0.33 for the quarter and $1.18 for the year.

162.    AOLTW's January 30, 2002 press release was false and misleading because it omitted to disclose that AOL/AOLTW had been engaging in a number of financial and accounting violations which inflated artificially AOL's/AOLTW's reported revenues and earnings.  AOLTW subsequently admitted that the financial results contained in that press release were materially false and misleading because it restated them as described more fully below.

163.    On or about March 25 and 26, 2002, respectively, AOLTW filed its Forms 10-K

and 10-K/A for the fiscal quarter and year ended December 31, 2001.  The Forms 10-K and 10-

K/A contained substantially the same financial information as the Company's January 30, 2002

press release, and falsely explained that although AOLTW faced a general weakness in the

advertising market, AOL's reported advertising revenues had still been growing, as follows:

> The growth in advertising and commerce revenues resulted from a general increase in advertising in the first half of 2001, the recognition of revenues related to advertising provided pursuant to contractual commitments entered into in prior periods, including amounts earned in connection with the early settlement of certain of those contracts....  In addition, advertising and commerce revenues benefited from third-party advertising packages sold across multiple business segments of the Company.  While AOL's advertising revenues grew for the year, it experienced a decline in advertising during the fourth quarter due to a general weakness in the advertising market.  Such weakness is expected to continue for at least the first half of 2002, which will be in contrast to the growth in advertising revenues experienced in the first half of 2001.

164.    On March 27, 2002, AOLTW issued its 2001 Annual Report.  The Company

continued to emphasize its purported growth, misleadingly stating that there was "a 13% increase

in AOL advertising and commerce revenues (from $2.369 billion to $2.688 billion)" but omitting

the key facts that material amounts of those advertising dollars were from sham and other

improper financial transactions and accounting practices which inflated artificially

AOL's/AOLTW's reported revenues and earnings.  AOLTW's stock closed at approximately

$23.60 per share.

165.    On May 6, 2002, AOLTW filed with SEC its Form 10-Q, reporting AOL total

revenue of $2.3 billion, and AOL EBITDA of $433 million for the quarter ended March 31,

2002. That Form 10-Q was false and misleading because it omitted to disclose that

AOL/AOLTW had violated GAAP and inflated its reported revenues and earnings. AOLTW subsequently effectively admitted that the financial results reported in that Form 10-Q were materially false and misleading because it restated those results as alleged more fully below.

166.    Between June 25 and July 16, 2002, AOLTW's stock dropped from over $15.40 to $12.61 per share, a loss of more than 18%. In response, the Company continued even at this time to steadfastly portray itself positively; indeed, as reported by The New York Daily News on July 16, 2002, an AOLTW spokesman once again assured investors that the Company is "comfortable with our accounting and our disclosure."

### C.    Public Revelations Begin to Emerge

167.    On July 18, 2002, The Washington Post ran a two-day article indicating that AOLTW had engaged in certain accounting practices. The article's conclusions were purportedly supported by the "review of hundreds of pages of confidential AOL documents and interviews with current and former company officials and their business partners", and highlighted a series of questionable advertising and other transactions totaling some $270 million (or more than 5%) out of some $5 billion in total transactions which authors examined, that were used to boost AOL's/AOLTW's revenues during the period July 2000 through March 2002. Among other things, the article cited the PurchasePro, eBay, 24dogs.com, Ticketmaster and Golf Channel transactions described earlier. A spokesperson for AOLTW was quoted in the article as denying any accounting violations. In fact, the AOLTW spokesperson was quoted as saying "AOL's statements provide our investors with all appropriate material information about our business."

168.    That same day, the AOLTW Board held a meeting following which AOLTW issued a press release abruptly announcing a major shake-up in its management structure, including the resignation of defendant Pittman, as follows:

> AOL Time Warner has adopted a new operating structure and made senior leadership appointments, Richard D. Parsons, Chief Executive officer, announced today.  Mr. Parsons also announced that Chief Operating Officer Robert W. Pittman has decided to step down as COO and as a director of AOL Time Warner and depart the Company after completing the transition to a new CEO at its America online division.

> Under the new structure, Don Logan, formerly Chairman and Chief Executive Officer of Time Inc., becomes Chairman of the new Media & Communications Group, comprising America Online, Time Inc. and Time Warner Cable, as well as the AOL Time Warner Book Group and Interactive Video unit. Jeff Bewkes, formerly Chairman and CEO of HBO, becomes Chairman of the new Entertainment & Networks Group, comprising HBO, New Line Cinema, The WB, Turner Networks, Warner Bros. and Warner Music.  The Group Chairmen will report directly to Mr. Parsons.

169.    The market's reaction to The Washington Post article and AOLTW's management changes was predictable, with the stock dropping to $12.45 on July 18, 2002, a 4% decline from the previous day's close, and down many multiples from the price at which Plaintiff bought her AOL shares.

170.    On July 19, 2002, The Washington Post ran the second installment of its expose on AOLTW, focusing on Colburn and AOL's Business Affairs division that was primarily responsible for the "unconventional" deals that were behind the purported growth of AOL's advertising revenues.   The article cited as examples transactions involving PurchasePro, Homestore and Telefonica SA.  That same day, AOLTW's stock price dropped another 7%, closing at $11.58.

171.    By July 24, 2002, it was reported that the SEC had opened a formal investigation into AOLTW's accounting practices; AOLTW's stock plummeted to $9.64, a drop of an

additional 15.5% from the previous day. In addition, the Company admitted at this time that because the SEC disagreed with AOL's accounting for the $400 million Bertelsmann transactions described above, the SEC would likely not approve AOLTW's then planned initial public offering to spin-off of its cable division to investors.

172.    On July 3l, 2002, AOLTW confirmed that the DOJ had begun a criminal investigation into its accounting practices.    In addition, around this time AOLTW had commenced its own investigation of its accounting practices.

173.    On August 13, 2002, David Colburn, one of AOL's top advertising officials who ran AOL's notorious Business Affairs division, was reportedly locked out of his office at AOL's headquarters in Dulles, VA and eventually fired.    AOL's Business Affairs division was subsequently dismantled.

174.    On August 14, 2002, AOLTW filed its Form 10-Q for the fiscal quarter ended June 30, 2002 and issued an accompanying press release, in which it first acknowledged that some $49 million related to three undisclosed transactions "may have been inappropriately recognized as advertising and commerce revenue" over six fiscal quarters during the period October 1, 2000 to March 31, 2002, specifically as follows:

| AOLTW Fiscal Quarter | Time Period Covered | Amount of Misstatement |
|---|---|---|
| [Pre-merger] | Oct. l, 2000 to Dec. 31, 2000 | $12.7 million |
| 1Q2001 | Jan. l, 2001 to March 31, 2001 | $5.3 million |
| 2Q2001 | April 1, 2001 to June 30, 2001 | $5.3 million |
| 3Q2001 | July 1, 2041 to Sept. 30, 2001 | $5.3 million |
| 4Q2001 | Oct. l, 2001 to Dec. 31, 2001 | $11.8 million |

1Q2002          Jan. l, 2002 to March 31, 2002          $8.5 million.

Without further explanation, the Company misleadingly claimed that this accounting revelation was "based on information that it learned within the past 10 days"; that it was "continuing its review of these and other advertising transactions at the AOL division"; and that "[t]he Company cannot predict at this time what action will be determined to be appropriate in response to all of the foregoing, although one possible outcome is a restatement of prior periods' results."

175.    On October 23, 2002, AOLTW announced that, as a result of its review of "certain advertising and commerce transactions" at its AOL division, AOLTW's financial results for the quarters ended September 30, 2000 through June 30, 2002 were materially overstated and would, in fact, need to be restated.   The total impact of the restatements will be to reduce AOLTW's consolidated advertising and commerce revenues by $190 million over these eight quarters, with a corresponding reduction in EBITDA for that same time period of $97 million. The total impact of these adjustments to AOLTW's consolidated operating and net income was, respectively, $83 million and $46 million.   Moreover, according to the Company's Form 8-K filed with the SEC that same day (October 23):

> As a result of the restatement announced on October 23, 2002 by AOL Time Warner Inc. (the "Company"), the Company's financial statements for the affected periods should no longer be relied upon, including the audited financial statements for 2000 and 2001 contained in the Company's annual report on Form 10-K for the year ended December 31, 2001.

The Company broke down the $190 million worth of inflated revenues as follows:

| AOLTW Fiscal Quarter | Time Period Covered | Amount of Misstatement |
|---|---|---|
| [Pre-merger] | July 1, 2000 to Sept. 30, 2000 | $66 million |
| [Pre-merger] | Oct. l, 2000 to Dec. 31, 2000 | $22 million |
| 1Q2001 | Jan. l, 2001 to March 31, 2001 | $14 million |

| 2Q2001 | April l, 2001 to June 30, 2001 | $42 million |
|--------|-------------------------------|-------------|
| 3Q2001 | July l, 2001 to Sept. 30, 2001 | $16 million |
| 4Q2001 | Oct. 1 , 2001 to Dec. 31, 2001 | $18 million |
| 1 Q2002 | Jan. l, 2002 to March 31, 2002 | $12 million |

176.    The fact that the Company has restated its financial statements is an admission that the financial statements originally issued were false, and that the overstatement of revenues and income was material.  Pursuant to GAAP, as set forth in APB 20, the type of restatement announced by AOLTW was to correct for material errors and/or irregularities in its previously issued financial statements.  See APB 20; FAS 3.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements, and it is often difficult, if not impossible, to generate the numbers when a restatement occurs.  See APB 20.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, i.e., when there is a change in the reporting entity, when there is a change in accounting principles used, or to correct an error or irregularity in previously issued financial statements.  AOLTW's restatements were not due to a change in the reporting entity or a change in accounting principles, but instead to irregularities and/or errors in previously issued financial statements.  Thus, AOLTW's restatement is an admission by the Company that its previously issued financial results and its public statements regarding those results, were materially false and misleading.

177.    On January 12, 2003, AOLTW announced that defendant Case was resigning as Chairman, effective as of the annual stockholders' meeting to be held in May 2003, but that he would continue to serve as a director of the Company.

178.    On January 16, 2003, AOLTW announced that its Board of Directors had decided to combine the positions of Board Chairman and CEO, and unanimously elected Richard Parsons to the post, also effective as of the Company's annual meeting in May 2003.

179.    On January 20, 2003, The Wall Street Journal reported that Veritas Software, with whom AOL had engaged in a round-trip transaction described earlier, would restate certain of its previously reported financial results on account of its software and advertising deals with AOL. Gateway also had to restate its results on account of its transactions with the Company described earlier.

180.    On January 28, 2003, AOLTW restated its previously-filed financial statements in accordance with its announcements on October 23, 2002, in a Form 10-K/A filed with the SEC for the year ended December 31, 2001, and Forms 10-Q/A for the quarters ended March 31 and June 30, 2002, by reversing and eliminating $190 million of AOL's/AOLTW's consolidated advertising and commerce revenues for each of the seven quarters ended September 30, 2000 through March 31, 2002.

181.    On January 30, 2003, The Wall Street Journal reported that AOLTW incurred a net loss for 2002 of **$98.7 billion** — among the largest in corporate history — after taking a fourth quarter charge of $45.5 billion mostly to write down the value of its AOL unit.  That charge was in addition to an earlier $54 billion write down of goodwill related to the AOL-TW Merger which AOLTW took in the first quarter of 2002.  The article stated that "[t]he huge loss underscores how much value has evaporated from what was once the largest, most-heralded merger in U.S. History," and noted that over $l00 billion in market value had been eliminated in AOLTW's market capitalization over the preceding 18 months.

182.    On March 28, 2003, AOLTW filed its 2002 Form 10-K with the SEC and belatedly admitted that it may need to restate up to an additional $400 million of advertising

revenue — more than twice what it restated just two months earlier — on account of the two transactions with Bertelsmann that had been booked in fiscal years 2001 and 2402.  Specifically, the Company broke down the pending $400 million restatement as follows:

| AOLTW Fiscal Quarter | Time Period Covered | Amount of Misstatement |
|---|---|---|
| 1Q2001 | Jan. l, 2001 to March 31, 2001 | $16.3 million |
| 2Q2001 | April l, 2001 to June 30, 2001 | $65.5 million |
| 3Q2001 | July 1, 2001 to Sept. 30, 2001 | $39.8 million |
| 4Q2001 | Oct. 1, 2001 to Dec. 31, 2001 | $0.5 million |
| 1 Q2002 | Jan. l, 2002 to March 31, 2002 | $80.3 million |
| 2Q2002 | April 1, 2002 to June 30, 2002 | $84.4 million |

The Company said that it would restate millions more in 2003.

183.    Notwithstanding the hundreds of millions of dollars in restatements the Company has announced to date, other reports have indicated that AOLTW may need to make further restatements totaling hundreds of millions or even substantially over one billion dollars more as a result of AOL's/AOLTW's overstatement of advertising revenue and other accounting improprieties alleged above, all of which also contributed to AOLTW's massive asset write-downs in 2002 of some $100 billion, among the largest in corporate history.

184.    On August 13, 2003, AOLTW provided the following update on the government's investigations into the Company's accounting improprieties:

> The SEC and the DOJ continue to conduct investigations into accounting and disclosure practices of the Company. Those investigations are focused on transactions principally involving the Company's America Online unit that were entered into after July 1, 1999, including advertising arrangements and the methods used by the America Online

unit to report its subscriber numbers.

In the 2002 Form 10-K, the Company disclosed that the staff of the SEC had recently informed the Company that, based on information provided to the SEC by the Company, it was the preliminary view of the SEC staff' that the Company's accounting for two related transactions between America Online and Bertelsmann, A.G. should be adjusted.

\* \* \*

Recently, the Office of the Chief Accountant of the SEC informed the Company that it has concluded that the accounting for these transactions is incorrect. Specifically, in the view of the Office of the Chief Accountant, the Company should have allocated some portion of the $400 million paid by Bertelsmann, A.G. to America Online for advertising, which was run by the Company and recognized as revenue, as consideration for the Company's decision to relinquish its option to pay Bertelsmann in stock for its interests in AOL Europe, and therefore should have been reflected as a reduction in the purchase price for Bertelsmann's interest in AOL Europe, rather than as advertising revenue. In addition, the Division of Enforcement of the SEC continues to investigate the facts and circumstances of the negotiation and performance of these agreements with Bertelsmann, including the value of the advertising provided thereunder.

185.    In addition, AOLTW disclosed that it, its AOL subsidiary and several current and former officials were being sued in dozens of putative class action and related lawsuits alleging violations of federal securities and state laws and the federal Employee Retirement Income Security Act. By this time, it also emerged that former senior AOLTW advertising executives Colburn and Kelley were being investigated not only for artificially inflating AOL's and AOLTW's reported financial results, but also for aiding and abetting the schemes of other companies to inflate their reported results, such as with respect to the Veritas and Gateway transactions described earlier.

186.    Further, it was also revealed that beginning at least as early as 2000, AOL was artificially boosting its reported Internet subscriber base by selling subscriptions in bulk to major

employers such as Target Corp., J.C. Penny and Sears Roebuck which purchased these subscriptions for as little as $1-3 per unit.  Bulk sales are generally considered to be of lower quality and less valuable than other sales because the subscriptions have higher cancellation rates.  The effect of not disclosing the extent of the bulk sales was to make AOL's subscription sales growth appear far more robust than it actually was, another key fact omitted from AOL's/AOLTW's public reports of its financial results.

187.    On September 18, 2003, AOLTW announced that its Board of Directors had voted to eliminate "AOL" from its name, and begin trading under HTW's old ticker symbol, "TWX", which change became effective on October 16, 2003.

188.    The highest levels of AOL's/AOLTW's management were aware of, and approved, the financial and accounting improprieties and false financial reporting detailed above.  For example, according to The Washington Post on July 18, 2002, former AOL employee Robert O'Connor of AOL's Business Affairs division reportedly outlined his concerns in a series of meetings in 2001 and 2002 with Pittman, Colbum, Kelly and other AOL executives, to no avail; subsequently in February 2002, O'Connor was reportedly told that he was not a team player and was reassigned.  Reportedly, O'Connor also raised concerns in the Spring of 2001 specifically regarding AOL's accounting treatment of the Homestore round-trip transactions described earlier.  Also in 2001 and 2002, O'Connor reportedly raised concerns regarding AOL's accounting practices directly with Robert Friedman, then head of AOL's interactive marketing division; Joseph Ripp, AOL's CFO; defendant Kelly, a former senior executive of both AOL and AOLTW; and Mayo Stuntz Jr., executive VP of AOLTW.  O'Connor left the company in March 2002.  Another former AOLTW employee, James Patti, another senior manager in AOL's Business Affairs division, also reportedly told senior executives in 2001 that he was

uncomfortable with some of AOL's advertising deals; Patti was reportedly laid off shortly thereafter, even though he had recently received a merit promotion.

189.    Top insiders also reportedly engaged in massive insider sales of AOL's, and then AOLTW's, common stock.  For example, during the time period between January and June 2001 alone, defendant Pittman sold 1.5 million shares for over $72 million; Kelly sold 400,000 shares for over $19 million; and defendant Case sold 2 million shares for over $100 million.  Further, this massive insider sell-off occurred while the Company was engaged in a $5 billion repurchase of its stock, thereby sustaining and even further inflating AOL's, and then AOLTW's, stock prices.  In fact, during the period of July through August 2000, top AOL insiders reportedly sold over 3 million AOL shares at prices as high as $60.44 per share, pocketing over $170 million in insider trading proceeds.  And following the AOL-TW Merger but prior to the initial public disclosure of AOLTW's improper accounting practices in July 2002, numerous top senior officials and Board members of AOLTW reportedly sold some 12.2 million shares of their AOLTW stock, pocketing more than $530 million in insider trading proceeds.

190.    Further, senior AOLTW executives, including current CEO and Board Chairman Richard Parsons, also reportedly obtained personal benefits from the Merger by accelerating the vesting of, and in many cases exercising, their stock options.  In fact, the parties explicitly agreed to accelerate the vesting of those options by inserting a special provision in their Merger Agreement.  As a consequence, the stock options held by senior HTW officials such as Levin became exercisable in full in January 2000, when HTW's Board of Directors approved the Merger.  Stock options held by senior AOL officials such as defendant Case became exercisable in January 2001 when the Merger was consummated, while other senior officials, such as defendant Pittman, were able to exercise their options in January 2002, one year after the Merger.  The fact that the these senior executives were able to accelerate and exercise their stock

options served as an additional incentive for them and other senior AOL/AOLTW executives to engage in the sham and other improper financial transactions and GAAP violations alleged herein, conceal AOL's/AOLTW's actual financial performance and operating results, and agree to and consummate the AOL-TW Merger.

191.    AOL's/AOLTW's Forms 10-Q identified above represented that the financial statements contained therein fairly presented AOL's/AOLTW's financial position, results of operations, and cash flows.  This representation was materially false and misleading in that the financial statements contained in these Forms to-Q were not presented fairly in conformity with GAAP because, among other things:

      a.    the accounting principles selected and applied in the preparation of these financial statements did not have general acceptance;

      b.    the accounting principles which pervasively impacted these financial statements were not appropriate in the circumstances;

      c.    the financial statements, including the related notes, were not properly informative of matters that affected their use, understanding and interpretation; and

      d.    these financial statements did not reflect the underlying events and transactions in a manner that presented the financial position and the results of operations within a range of acceptable limits that were reasonable and practicable to attain in financial statements.

192.    In addition to containing false and misleading financial statements, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in AOL's/AOLTW's SEC Forms 10-Q and 10-K specified above was also materially false and misleading because it failed to comply with the spirit of the disclosure guidelines established by the SEC including, among others, Management's Discussion and Analysis of Financial

Condition and Results of Operations, SEC Release Nos. 33-6835 & 34-26831 (May 18, 1989)

(http://www.sec.gov/rules/interp/33-6835.htm) which, in part, provides as follows:

> The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant's prospects for the future. As the Concept Release states:

> "The Commission has long recognized the need for a narrative explanation of the financial statements because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance.  MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials."

> As the Commission has stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for the understanding and evaluation of the individual company."

> The Commission has determined that interpretive guidance is needed regarding the ... MD&A analysis on a segment basis....  [A] multi-segment registrant preparing a full fiscal year MD&A should analyze revenues, profitability, and the cash needs of its significant industry segments.  To the extent any segment contributes in a materially disproportionate way to those items, or where discussion on a consolidated basis would present an incomplete and misleading picture of the enterprise, segment discussion should be included.

See also, SEC Staff Accounting Bulletin No. 101 (stating, among other things, that MD&A should disclose "unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue

...."). AOL's/AOLTW's MD&A in their respective Forms 10-Q and 10-K violated these and other provisions, among other things, because such MD&A failed to properly and timely disclose that AOL/AOLTW had been engaging in a number of financial and accounting violations which inflated artificially AOL's/AOLTW's reported revenues and earnings, and that AOL's/AOLTW's financial statements did not conform to GAAP or present fairly AOL's/AOLTW's operating results.

### D. Plaintiff Relied On The Financial Reports Issued by AOL and AOLTW

193.    In connection with her purchase and holding of AOL, AOLTW, and HTW securities, Plaintiff relied on the SEC filings, press releases and media and other financial reports issued by AOL, HTW and AOLTW alleged above; on the legitimacy and propriety of AOL's, HTW's and AOLTW's financial transactions and accounting practices; on AOL's, HTW's and AOLTW's public statements about their financial transactions and accounting practices; and on AOL's, HTW's and AOLTW's public statements regarding their financial condition, results, operations and revenues and earnings, and were damaged thereby.

194.    Plaintiff also relied on the accuracy of AOL's, HTW's and AOLTW's financial reporting to the marketplace, and are therefore entitled to a presumption of reliance under the fraud-on-the-market doctrine.  Plaintiff is entitled to such presumption because, among other things, the market for AOL, HTW and AOLTW securities was at all times an efficient market in that, among other things: these companies' stocks met the requirements for listing and were listed on the NYSE, a highly efficient market that quickly reflects all publicly available information concerning a listed company; these companies filed periodic public reports with the SEC that impacted the prices of their securities; the trading volume of these securities was substantial throughout the relevant times during the period 1998-2002, indicating that the market for those securities was liquid; these companies regularly communicated with public investors

via established market communication mechanisms, including via press releases and regular periodic conferences with groups of market analysts; these companies' stocks were followed by numerous analysts at major brokerage firms, who issued investment reports which entered the public marketplace; and the market for these companies' securities promptly digested new and current information regarding these companies from all publicly available sources and reflected such information in the prices of their securities.

### E.     No Statutory Safe Harbor

195.     The statutory safe harbor that applies to certain forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded here.  First, the safe harbor does not apply to any of the false financial statements alleged in this Complaint.  Second, the safe harbor does not apply to any of the false statements pleaded here which concern AOL's/AOLTW's then current and/or historical results, because those statements do not qualify as forward-looking statements.  Further, to the extent any of the false statements alleged herein were forward-looking, they still do not qualify for the safe harbor because no such forward-looking statement was identified as "forward-looking" when made, nor was it stated that actual results could differ materially from those projected, nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements accompany those forward-looking statements.  Finally, to the extent any of the false statements alleged herein are considered forward looking and were made or authorized by an executive officer of AOL or AOLTW, the statutory safe harbor is inapplicable for the additional reason that any such statement was actually known by the speaker to be false when made.

## FIRST CLAIM FOR RELIEF

**(Against Defendants AOLTW, AOL, HTW for Violations of Section 11
of the Securities Act)**

196.    Plaintiff realleges each of the foregoing allegations as if fully set forth here except those allegations which sound in fraud.

197.    This claim is brought by Plaintiff against AOLTW, AOL, and HTW.

198.    In particular, this claim is brought under § 11 of the Securities Act against AOLTW, AOL, HTW in their capacity as the registrants and against AOLTW as an issuer of securities; against the Individual Defendants as signers of the Merger Registration Statement, the Supplemental Registration Statement and/or the Bond Registration Statement, and/or in their capacities as persons who were named in, or who were, or who were about to become, directors of AOL, AOLTW or HTW or persons who performed similar functions at the time the Merger Registration Statement, the Supplemental Registration Statement and/or the Bond Registration Statement were/was filed under §§ 11(a)(1 ), (2) and/or (3) of the Securities Act.

199.    AOLTW issued shares of its common stock, and Plaintiff acquired such shares, pursuant or traceable to the Merger Registration Statement and the Supplemental Registration Statement AOLTW filed with the SEC on, respectively, May 19, 2000 and December 28, 2000.

200.    The Merger Registration Statement, the Supplemental Registration Statement was materially false and misleading because they included or incorporated artificially inflated financial data concerning both AOL and *pro forma* financial information for the combined AOLTW, including AOL and HTW, certain of which the Company subsequently restated as alleged more fully above.  The Company effectively admitted that the reported financial results of AOLTW and AOL for the fiscal years 2000-2002 were materially false because it restated those results, all as provided by GAAP and alleged more fully above.

201.    Plaintiff has sustained damages as a result of her acquisition of AOLTW securities at artificially inflated prices.

202.    Plaintiff has complied with the applicable statute of limitations for claims under § 11 of the Securities Act.   None of the false and misleading statements or omissions or other financial and accounting improprieties alleged above was known to Plaintiff at the time she acquired her AOLTW securities. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of such improprieties at the time she acquired her AOLTW common stock.   Plaintiff, and the market, began to be on notice of certain of the allegations herein no earlier than July 2002, when <u>The Washington Post</u> published a two-day article referencing some of AOL's/AOLTW's accounting violations.   The limitations period has been tolled as to Plaintiff's claims by virtue of the fact that numerous class action lawsuits have been filed concerning the same or similar allegations, all of which lawsuits have amply put defendants on notice of the claims and allegations asserted herein.

203.    As a consequence, AOLTW, AOL and HTW are strictly liable to Plaintiff under § 11 of the Securities Act.   In addition, the Individual Defendants failed to exercise reasonable diligence and/or had no reasonable grounds to believe that the Merger Registration Statement, the Supplemental Registration Statement and/or Bond Registration Statement were free of material misstatement and omission at the time those documents were filed with the SEC, and these defendants are therefore also liable to Plaintiff under § 11 of the Securities Act.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(Against Defendants AOLTW, AOL, HTW**
**for Violations of Section 12(a)(2) of the Securities Act)**

204.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

205.    This claim is brought by Plaintiff against AOLTW, AOL, and HTW.

206.    Defendants AOLTW, AOL, HTW acted as the sellers, offerers or solicitors of purchases of the AOLTW common stock that Plaintiff acquired pursuant or traceable to these defendants' Joint Proxy/Prospectus for the AOL-TW Merger.  The Joint Proxy/Prospectus contained in the Merger Registration Statement and incorporated in the Supplemental Registration Statement was false and misleading because, among other things, it included or incorporated artificially inflated financial data concerning both AOL and *pro forma* financial information for the combined AOLTW, including AOL and HTW, certain of which the Company subsequently restated as alleged more fully above.  The Company effectively admitted that the reported financial results of AOLTW and AOL for the fiscal years 2000-2002 were materially false because it restated those results, all as provided by GAAP and alleged more fully above.

207.    Without the substantial and direct selling and solicitation activities of AOLTW, AOL, and HTW by means of those prospectuses, Plaintiff could not and would not have acquired AOLTW's securities at all or would have acquired those securities at prices lower than she did.

208.    Plaintiff has sustained damages as a result of her acquisition of AOLTW securities at an artificially inflated price.  Because Plaintiff has sold those securities, she seeks damages pursuant to § 12(a)(2) of the Securities Act.

209.    Plaintiff has complied with the applicable statute of limitations for claims under § 12(a)(2) of the Securities Act.  None of the false and misleading statements or omissions or other financial and accounting improprieties alleged above was known to Plaintiff at the time she acquired her AOLTW securities.  Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of such improprieties at the time she acquired her AOLTW securities.  Plaintiff, and the market, began to be on notice of certain of the allegations herein no earlier than July 2002, when The Washington Post published a two-day article referencing some

of AOL's/AOLTW's accounting violations. The limitations period has been tolled as to Plaintiff's claims by virtue of the fact that numerous class action lawsuits have been filed concerning the same or similar allegations, all of which lawsuits have amply put defendants on notice of the claims and allegations asserted herein.

210.    By reason of the misconduct alleged herein, AOLTW, AOL, and HTW violated § 12(a)(2) of the Securities Act and are liable to Plaintiff.

## THIRD CLAIM FOR RELIEF

### (Against Case and Pittman for Violations of Section 15 of the Securities Act)

211.    Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

212.    This claim is brought by Plaintiff against the Individual Defendants.

213.    The Individual Defendants, by virtue of their positions, stock ownership, and specific acts described more fully above, were at all times material controlling persons of AOLTW within the meaning of § 15 of the Securities Act.

214.    By reason of their own culpable misconduct and the misconduct of AOLTW as alleged more fully above, Plaintiff has suffered damages by acquiring AOLTW securities at artificially inflated prices.

215.    Plaintiff has complied with the applicable statute of limitations for claims under § 15 of the Securities Act. None of the false and misleading statements or omissions or other financial and accounting improprieties alleged above was known to Plaintiff at the time she acquired her AOLTW securities. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of such improprieties at the time she acquired her AOLTW securities. Plaintiff, and the market, began to be on notice of certain of the allegations herein no earlier than July 2002, when The Washington Post published a two-day article referencing some

of AOL's/AOLTW's accounting violations. The limitations period has been tolled as to Plaintiff's claims by virtue of the fact that numerous class action lawsuits have been filed concerning the same or similar allegations, all of which lawsuits have amply put defendants on notice of the claims and allegations asserted herein.

216. The Individual Defendants are therefore liable to Plaintiff under § 15 of the Securities Act.

## FOURTH CLAIM FOR RELIEF

### (Against Defendants AOLTW, AOL, Case and Pittman for Fraud)

217. Plaintiff realleges each of the foregoing allegations as if fully set forth herein.

218. This claim is brought by Plaintiff against defendants AOLTW, AOL and the Individual Defendants for common law fraud.

219. Defendants AOLTW, AOL and the Individual Defendants knowingly or recklessly made material misrepresentations of fact in connection with Plaintiff's purchases and holdings of AOLTW and AOL common stock and debt securities, in AOL's/AOLTW's SEC filings, press releases and other public statements. These defendants' misrepresentations concerned AOL's/AOLTW's financial condition, operating results and reported revenues and earnings. These defendants made these misrepresentations with the intention that, among other things, Plaintiff would directly or indirectly rely upon them, and Plaintiff did directly or indirectly, so rely. As alleged more fully above, these misrepresentations of material fact included the following, among others:

> a, that AOLTW's and AOL's financial results were free of material misstatement and "fairly present" these companies' financial results;

> b. that AOLTW's and AOL's accounting practices conformed to GAAP and SEC regulations;

      c.      that AOLTW's and AOL's internal controls were appropriate and conformed to applicable practices;

      d.      that AOLTW and AOL had properly recognized and accurately reported their revenues and earnings; and

      e.      that AOLTW and AOL properly classified their assets and other balance sheet accounts.

220.    Further, AOL, AOLTW, and the Individual Defendants knowingly and recklessly disregarded that numerous representations and statements made in AOL's/AOLTW's respective SEC filings and other public communications were false and misleading and failed to timely and accurately disclose the true facts. In particular, and as alleged more fully above, these defendants knew, among other things, that because of AOL's/AOLTW's financial and accounting violations, AOL's/AOLTW's respective financial statements and reports covering the quarters and years between 1998 and 2002 contained untrue statements of material fact and material omissions, and did not comply with GAAP, all because they included materially inflated statements of revenues and earnings, certain of which AOLTW later restated.

221.    AOL, AOLTW, and the Individual Defendants also omitted to timely and accurately disclose in AOL's/AOLTW's SEC filings and other public statements identified above various material facts which they were under a duty to disclose including, among other things, AOLTW's and AOL's accounting violations; AOLTW's and AOL's actual financial performance and condition; the likelihood that these companies would have to restate their previously reported revenues and earnings; and the true circumstances regarding AOL's/AOLTW's purported advertising and e-commerce transactions, all as alleged more fully above.

222.    As a direct and proximate result of AOL's, AOLTW's and the Individual Defendants' fraudulent misconduct, Plaintiff acquired and held AOLTW's and AOL's securities at artificially inflated prices, and was injured thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.    Awarding Plaintiff rescission or compensatory damages in an amount which may be proven at trial, together with interest thereon; and in addition,

2.    Awarding Plaintiff pre-judgment and post-judgment interest, as well as other costs; and in addition,

3.    Awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable relief and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict defendants' assets to assure Plaintiff has an effective remedy.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

By: _____

Jonathan C. Dailey, Esq. (Bar # 448141)
Kaplan, Buckner & Kostecka
3 Bethesda Metro Center
Suite 430
Bethesda, MD  20814
(301) 718-1900
(301) 718-8359 (fax)

Counsel for Plaintiff Kathleen M. Beusterien

Dated:   July 12, 2005